RECEIVED

JUN    2018

HUTON

CLERK U.S. DISTRICT COURT

UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

beverly-ann :jones-young, Nameholder of
fictitious Name BEVERLY ANN YOUNG
STATE OF MISSOURI REGISTRATION
NUMBER X001319462

Plaintiff

v.

WELLS FARGO BANK, N.A. AND
JAMES R. SHREWSBERRY; ANSELMO
LINDBERG & ASSOCIATE LLC;
GOVERNMENT NATIONAL
MORTGAGE ASSOCIATION AS
TRUSTEE FOR SECURITIZED TRUST
GINNIE MAE REMIC TRUST 2012-129;
MORTGAGE ELECTRONIC
REGISTRATION SYSTEM AKA
"MERS" AND DOES 1 THROUGH 164
INCLUSIVE

Defendants.

**PLAINTIFFS' COMPLAINT FOR**:

**(1) IDENTITY THEFT, FRAUD AND COLLISION**
**(2) WRONGFUL FORECLOSURE**
**(3) NEGLIGENCE**
**(4) UNJUST ENRICHMENT;**
**(5) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(6) SLANDER OF TITLE**
**(7) QUIET TITLE;**
**(8) RICO;**
**(9) VIOLATION OF TILA AND HOEPA**
**(10) VIOLATION OF RESPA**
**(11) RESCISSION; AND**
**(12) DECLARATORY RELIEF**

18cv3945
Judge Charles R. Norgle,
Magistrate Judge Sidney I. Schenkier

## COMPLAINT OF IDENTITY THEFT AND WRONGRUL FORECLOSURE

**COMES NOW**, beverly-ann :jones-young, Name Holder of the State of Missouri Registered

Fictitious Name, BEVERLY ANN YOUNG, file number X001319462 and Minnesota Assumed

Name, BEVERLY ANN YOUNG, file number 977095000021 (*See* Exhibit A) filing this

Complaint by special appearance. As Plaintiff, I am standing in my unlimited commercial

liability as a Secured Party Creditor complaining of the Defendants as named above, and each of

them, as follows:

## THE PARTIES

1.      Plaintiff is now and at all times, registered in good standing to do busines in the

County of Cook, State of Illinois.

2.      Defendant, WELLS FARGO BANK, N.A. (herein referred to as "Wells Fargo"),

as Servicer / Trustee for the GINNIE MAE REMIC TRUST 2012-129 (herein referred to as "the TRUST 2012-129"). Plaintiff is informed and believes, and thereon alleges that, Defendant Wells Fargo, is a national banking association, doing business in the County of Cook, State of Illinois and is the purported Master Servicer for the Securitized Trust and/or a purported participant in the imperfect securitization of the Note and/or the Mortgage/Deed of Trust as more particularly described in this Complaint.

3.      James R. Shrewsberry (hereinafter known as "Mr. Shrewsberry") is the Chief Financial Officer of Wells Fargo Bank, N.A. and is responsible for Wells Fargo's financial management functions including treasury, controllers, financial reporting, tax management, asset-liability management, corporate development and investor relations. Wells Fargo is located at 420 Montgomery Street, San Francisco, CA 94104.

4.      Defendant, ANSELMO LINDBERG & ASSOCIATES LLC (hereinafter referreed to as "Anselmo"), Plaintiff is informed and believed, and thereon alleges that Anselmo Lindberg & Associates, LLC is a foreclosure mill, conducting business in the State of Illinois at 1771 W. Diehl Road, Suite 120, Naperville, IL 60563. Plaintiff is further informed and believes, and thereon alleges, that Anselmo is the attorney colluding with Wells Fargo committing the identity theft.

5.      Defendant, GOVERNMENT NATIONAL MORTGAGE ASSOCIATION (hereinafter known as "Ginnie Mae"), Plaintiff is informed and believes, and thereon alleges, that Ginnie Mae is a corporation, doing business in the County of Cook, State of Illinois and is the purported Investor/Guarantor (_See_ Exhibit B) for the Ginnie Mae Securitized Trust and/or a purported participant in the imperfect securitization of the Note and/or Mortgage as more particularly described in this Complaint.

-2-

6.      Defendant, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., (hereinafter known as "MERS"). Plaintiff is informed and believes, and thereon alleges, that MERS is a corporation duly organized and existing under the laws of Illinois, whose last known address is 1818 Library Street, Suite 300, Reston, Virginia 20190; website: http://www.mersinc.org. MERS is doing business in the County of Cook, State of Illinois. Plaintiff is further informed and believes, and thereon alleges, that Defendant MERS is the purported Beneficiary under the Mortgage/Deed of Trust and/or is a purported participant in the imperfect securitization of the Note and/or the Mortgage/Deed of Trust, as more particularly described in this Complaint.

7.      At all times relevant to this action, the Name Holder has lived at the Property located at 1905 E. 172nd Street, South Holland, Illinois [60473] (the "Property").

8.      Plaintiff does not know the true names, capacities, or basis for liability of Defendants sued herein as Does 1 through 100, inclusive, as each fictitiously named Defendant is in some manner liable to Plaintiff, or claims some right, title, or interest in the Property. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believe, and therefore allege, that at all relevant times mentioned in this Complaint, each of the fictitiously named Defendants are responsible in some manner for the injuries and damages to Plaintiff so alleged and that such injuries and damages were proximately caused by such Defendants, and each of them.

9.      "All Persons Unknown, Claiming any Legal or Equitable Right, Title, Estate, Lien, or Interest in the Property described in the Complaint adverse to Plaintiffs' Title, or any cloud on Plaintiffs' Title thereto" are sued herein pursuant to Illinois Code of Civil Procedure Section 2-413.

10. Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, each of the Defendants were the agents, employees, servants and/or the joint-venturers of the remaining Defendants, and each of them, and in doing the things alleged herein below, were acting within the course and scope of such agency, employment and/or joint venture.

## JURISDICTION

11. The transactions and events which are the subject matter of this Complaint all occurred within the County of COOK, State of ILLINOIS.

12. The Property is located within the County of COOK, State of ILLINOIS with an address of 1905 E. 172nd, South Holland, Illinois [60473].

## INTRODUCTION

13. This is an action brought by Plaintiff for declaratory judgment, injunctive and equitable relief, and for compensatory, special, general and punitive damages for identity theft and wrongful foreclosure. Plaintiff has a conflict with the law and when there is a conflict between the rules at law and the rule of equity over the same matter, the rules of equity shall apply and prevail. Plaintiff request that the rules of equity apply in this matter. Ex Aequo Et Bono – what is just and fair or according to equity and good conscience? A decision-maker who is authorized to decide ex aequo et bono is not bound by legal rules but may take account of what is just and fair. The exclusion of the "Emergency Banking Relief Act" is the inclusion of my right under the "Judiciary Act of 1789".

## SPECIFIC ALLEGATIONS

14. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

15. This case arises out of Defendants' egregious, ongoing and far reaching fraudulent schemes for improper use of Plaintiff's identity, copyright and trademark infringement, conversion of promissory note, fraud in the execution, usury, and breaches of fiduciary obligations as Mortgagee or "Trustee" on the Mortgage, "Mortgage Brokers," "Loan Originators," "Loan Seller," "Trustee of Pooled Assets," "Trustee or officers of Structured Investment Vehicle", "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of 'Asset-backed Certificates'," "Seller of 'Asset-Backed' Certificates (shares or bonds)," "Special Servicer" and Trustee, respectively, of Plaintiff's mortgage loan which was pooled into the GINNIE MAE REMIC TRUST 2012-129 trust (hereinafter "the Ginnie Mae" trust).

16. Plaintiff is the Nameholder of the Subject Property under the terms of a Warranty Deed executed by Katherine Filipek and Daniel Cleve dated October 16, 2012. *(See* Exhibit C).

17. On or about September 16, 2012, (hereinafter referred to as "Closing Date") Defendants conspired and worked in collusion leading Plaintiff to believe she was receiving a mortgage loan (secured by the Subject Property) in the amount of $87,718.00 when in fact the Plaintiff's promissory note was deposited (credited) and used to pay the sellers. Wells Fargo converted Plaintiffs' property title into shares transferred into constructive trust and pledged/sold the promissory note to investors for the GINNIE MAE REMIC TRUST 2012-129.

18. A trust res has been created in Plaintiffs' name to finance the fictitious mortgage debt in the name of the surety, BEVERLY ANN YOUNG. Plaintiffs' has registered with the State of Missouri Registered Fictitious Name, BEVERLY ANN YOUNG, file number X001319462 and Minnesota Assumed Name, BEVERLY ANN YOUNG, file number

977095000021 in order to conduct business "in good standing" here in Illinois and to separate the living woman from the fictitious/assumed name (surety).

19.     Defendants have committed identity theft, intentional trespass, infringement, unauthorized use of Plaintiffs' signature, unauthorized derivative conversion in name and form, unauthorized conversion of signature/name to digital public/private PKI Key signatures and theft thereof. Unauthorized pledge to IRS e-file filing system, theft of private properties, personal and intellectual properties, assets, proceeds, income concealed in IRS tax shelters, unauthorized manipulation of status and elections and subscriptions, breach of goodwill, trust, contract to the unlawful theft of estate and credit union engineered by Defendants with kickbacks to county/state actors and judges. All of this fraud by setting up and using Plaintiff's name under the intentionally concealed MERS/NB Agreement (hereinafter "MERS Agreement),(*See* Exhibit D) a credit/security agreement.

20.     Defendant are not using a Deed of Trust or promissory note but rather the authentication of the Plaintiffs' "handwritten signature" that has been unlawfully converted to a digital signature, certificate and public/private keys.

21.     Plaintiff disputes the title and ownership of the real property in question, which is the subject of this action, in that the originating mortgage lender, and others alleged to have ownership of Plaintiff's mortgage note and/or Mortgage/Deed of Trust, have unlawfully sold, assigned and/or transferred their ownership and security interest in a Promissory Note and Mortgage/Deed of Trust related to the Property, and, thus, have unlawfully foreclosed upon the property, and do not have lawful ownership or a security interest in the Property which is described in detail herein. For these reasons, the Court should Quiet Title the property in Plaintiff's name.

22.    Plaintiff disputes title and ownership by Wells Fargo Bank, N.A. as Wells Fargo lacks standing as Defendant is the Servicer whom Plaintiff mailed payments to. Furthermore, it is well established state law that the assignment of a Mortgage does not automatically assign the underlying promissory note and right to be paid and the security interest is incident of the debt. Therefore, Wells Fargo cannot be a real party in interest.

23.    Defendants pooled and securitized the note into the GINNIE MAE REMIC TRUST 2012-129 (*See* Exhibit E) solely to provide a large supply of money to lenders for originating loans, to provide investments to bond holders and create a situation whereby certain tax laws known as the Real Estate Mortgage Investment Conduit Act ("REMIC") were observed and the Issuing Entities and Lenders would be protected from "either" entity going into bankruptcy.

24.    Defendants pooled and converted the Note into the GINNIE MAE REMIC TRUST 2012-12. The Mortgage was never transferred and the Note at issue in this case was pooled, transferred and securitized by Defendants, with other loans and mortgages with an aggregate principal balance of approximately $829,795,263 into the GINNIE MAE REMIC TRUST 2012-129 Trust, which is a Common Law Trust formed pursuant to New York law. A detailed description of the mortgage loans which form the Ginnie Mae Trust is included in Form 424B5 ("the Prospectus"), (*See* Exhibit F). Due to the large size of the Prospectus, I did not attach all of it as an exhibit however it can be viewed on-line at:

> http://www.ginniemae.gov/investors/disclosures_and_reports/Pages/remic_prospectuses.
> aspx?YearDropDown=2012&MonthDropDown=November; OR
> http://www.ginniemae.gov/doing_business_with_ginniemae/investor_resources/Prospect
> uses/ProspectusesLib/2012Nov20-129.pdf

25.    MERS list Ginnie Mae as the investor on its website and Wells Fargo as the Servicer but has protected Wells Fargo by hiding all of the investors by not recording the

splitting of the investment trust into 27 separate investment classes with the County Recorder. (*See* Exhibit G)

26.     In order to streamline the securitization process, the investment banks created an entity called Mortgage Electronic Registrations System ("MERS"), who is one of the Defendants in this case. The investment banks, in addition to using MERS' electronic database to track the buying, selling, and assignments of securitized mortgage notes (bypassing the county clerks' offices), transferred deeds of trust to MERS, thereby separating the mortgage note from the Mortgage. MERS holds the Mortgage for whoever later claimed to be the "owner" of the Plaintiff's mortgage note for foreclosure purposes.

27.     Plaintiff's loan was securitized, with the Note not being properly transferred to Defendant, Wells Fargo, acting as the Trustee for the GINNIE MAE REMIC TRUST 2012-129. Wells Fargo is not the true owner of the note and is committing fraud as the GINNIE MAE REMIC is the true owner. Plaintiff also alleges, that the GINNIE MAE REMIC had no officers or directors and no continuing duties other than to hold assets and to issue the series of certificates of investment in mortgage backed securities as described in the Prospectus. (*See* Exhibit H)

28.     No documents or records can be produced that demonstrate that prior to the closing date for the TRUST, the Mortgage/Note was duly assigned and indorsed or transferred and delivered to the TRUST, including all intervening transfers/assignments via the trustee Wells Fargo.

29.     Plaintiff alleges that Defendants, and each of them, cannot show proper receipt, possession, transfer, negotiations, assignment and ownership of the borrower's original Promissory Note and Mortgage, resulting in imperfect security interests and claims. It has been

settled beyond controversy that a national bank, under Federal Law being limited in its powers and capacity, cannot lend its credit by guaranteeing the debts of another. All such contracts entered into by its officers are ultra vires. (*See* Farmers and Miners Bank v. Bluefield Nat 'l Bank, 11 F 2d 83, 271 U.S. 669). Wells Fargo never loaned Plaintiff any money.

30.     Plaintiff further alleges that Defendants, and each of them, cannot establish possession and proper transfer and/or indorsement of the Promissory Note and/or proper assignment of the Mortgage herein; therefore, none of the Defendants have perfected any claim of title or security interest in the Property. Defendants, and each of them, do not have the ability to establish that the mortgages that secure the indebtedness, or Note, were legally or properly acquired.

31.     Where the Mortgagee has "transferred" only the Mortgage, the transaction is a nullity and the "assignee" having received no interest in the underlying debt or obligation, has a worthless piece of paper (4 Richard R. Powell), Powell on Real Property, § 37.27 [2] (2000)..Since the loan was sold, pooled and converted into a security, such event would indicate that the alleged holder can no longer claim that it is a real party of interest, as the original lender has been paid in full.

32.     Defendant Wells Fargo, in preparation of litigation against Plaintiff, drafted and recorded the purported fraudulent assignment of mortgage and note 1 ½ year later.

33.     Additionally, Plaintiff brings causes of action against all Defendants for identity theft and fraud by signing Plaintiff's name on the MERS Agreement and other documents without the consent and/or knowledge of Plaintiff, fraud by acting as power-of attorney without the consent and/or knowledge of Plaintiff, intentional infliction of emotional distress, rescission, declaratory relief, violations of T.I.L.A., R.E.S.P.A., RICO and H.O.E.P.A, upon the facts and

circumstances surrounding Plaintiff's original loan transaction and subsequent securitization. Defendants' violations of these laws are additional reasons this Court should quiet title in the property and award damages, rescission, declaratory judgment, and injunctive relief as requested below.

34.     That in furtherance of said wrongful conduct, Defendants worked in collusion in urging the court to rely on the false and misleading MERS Assignment of Mortgage as evidentiary support of Wells Fargo's right to collect on the alleged debt.

35.     All parties involved have colluded with one another to commit fraud and deception.

## FIRST CAUSE OF ACTION FOR
## IDENTITY THEFT, FRAUD AND COLLUSION

### A. Identity Theft and Fraud by Wells Fargo, GINNIE MAE and MERS

36.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

37.     Fraud is any false representation of material facts made with knowledge of falsity and with intent that it shall be acted on by another in entering into contract, and which is so acted upon, constitutes 'fraud,' and entitles party deceived to avoid contract or recover damages. See Barnsdall Refining Corn. v. Birnam Wood Oil Co. 92 F 26 817.

38.     Defendants have conspired and colluded to commit a fraudulent foreclosure, identity theft and fraud in the concealment by setting up and signing a Security Agreement in Plaintiffs' name without Plaintiff's knowledge or consent. The MERS Security Agreement (hereinafter "MERS Agreement") or the MERS United States Registered Trademark between MERS and Wells Fargo (who own MERS stock) was set-up to steal and give ownership of Plaintiff's identity, collateral, inventory, licenses, patents and trademarks, real estate,

-10-

receivables, all equipment, proceeds and any and all other intangibles. This one-sided Agreement allows the Defendants to sign any and all documents necessary to steal everything owned by the Plaintiff and obligates the Plaintiff to be responsible for all present and future debt. (*See* Exhibit I – MERS Agreement) which is same as Exhibit D

39. Defendants have intentionally omitted the fact that U.S. Registered Trade/Service Marks through TESS were set up in Plaintiff's name, which is a violation of the Lanham Act. (*See* Exhibit J ) These Patents and Trademarks are used to trade under Plaintiff's identity and receive unjust enrichment in Plaintiff's name.

40. The MERS Agreement irrevocably authorized and empowers the Banks, its officers, employees and authorized agents to endorese and sign the name of the Borrower on all checks, drafts, money orders or other media of payment so delivered, and such endorsements or assignments shall, for all purposed, be deemed to have been made "by the Plaintiff or so-called borrower" prior to any endorsement or assignment thereof by the Bank. This is all fraud and identity theft as it has not been authorized by the Plaintiff.

41. The MERS Agreement authorized the Banks to ask for, demand, collect, receive and give acquittances and receipts for any and all amounts due and to become due under "any" Collateral in the name of the Plaintiff (or so-called Borrower) or its own name or otherwise which is identify theft not authoized by the Plaintiff.

42. The MERS Security Agreement has **"NOT"** been duly executed and deliver by the Plaintiff (or so-called borrower) and does not constitute the legal, valid and binding obligation of the Plantiff to allow bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or affecting the enforceability by the Banks in commiting fraud and identity theft unbeknowth to the Plaintiff.

-11-

43. Pursuant to Section 3.2, Title to Collateral from the MERS Agreement which reads: Except for the security interests granted to the Bank pursuant to this Security Agreement, the Borrower is the sole owner of each item of the Collateral, having good and marketable title thereto, free and clear of any and all Liens, except Permitted Liens. The MERS Agreement is admitting that the Bank does not own the subject property and the home was stolen via wrongful foreclosure.

44. A Cash Collateral Account was illegally opened (without Plaintiff's knowledge or consent) in Plaintiff's name which serves as a clearing account for the purpose of placing proceeds from the documents of title, securities, negotiable instruments or other cash equivalents from Plaintiff's estate and/or cesti que trust to be moved into Defendants Accounts later.

45. Defendants are money laundering through unlawful conversion to offshore tax havens. Plaintiff's name and identity stolen by use of the MES Agreements is what the theft is based around, by theft through intentionally concealed means and methods. This is fraud as opposed to incorporation by reference which presumes that Plaintiff gave them. This is fraud by theft and conversion, which is a valuing and revaluing of Plaintiff to pilfer Plaintiff's assets and properties taken offshore to hide them, until such time they can be repatriated to the states through a foundation by claiming forced abandonment.

46. MERS (acting as beneficiary) assigned the Mortgage/Deed of Trust to Wells Fargo. The Assignment by MERS was improper because MERS never had a beneficial interest in the Subject Property and was merely a "nominee" under the Deed of Trust. MERS also breached their implied covenant of good faith and fair dealing with Plaintiff when MERS allowed their alleged agent to execute the Assignment in order to appoint a new Trustee to begin foreclosure on the subject property. Therefore, the Assignment is invalid and void.

47.     A "True Sale" (which was never done) of the loan would be a circumstance whereby one party owned the Note and then sold it to another party. An offer would be made, accepted and compensation given to the "seller" in return for the Note. The Notes would be transferred, and the Deeds of Trust assigned to the buyers of the Note, with an Assignment or Transfer made every step of the way, and, furthermore, each Note would be indorsed to the next party by the previous assignee or transferee of record. These transactions have been hidden by MERS working in collusion with Defendants.

48.     MERS is a criminal entity set-up to hide the securitization process and to track the buying, selling, and assignments of securitized mortgage notes (bypassing the county clerks' offices). Banks transfer deeds of trust to MERS, thereby separating the mortgage note from the Mortgage/Deed of Trust. MERS assigns the Mortgage/Deed of Trust for whoever later claims to be the "owner" for foreclosure of the homeowners' mortgage note all the time knowing who the true owner of record is, thereby committing fraud.

49.     MERS is a complete and total fraud. It has no employees, but claim thousands of officers who have not been hired or appointed by MERS; rather they are assigned signing responsibilities by lenders, servicers, or foreclosure firms. No actual officer of MERS has ever signed any documents in connection with the assignment or transfer of any debt, note, deed of trust or mortgage. They are not trained by MERS or even given access to MERS computers to verify the affidavits they sign are accurate. This is complete and total fraud.

50.     Plaintiff was never informed nor was it disclosed to Plaintiff that a Security Agreement(MER Agreement) giving ownership to all of Plaintiff's personal and intellectual ownship was set-up in Plaintiff name. This is fraud and identity theft. Pursuant to 15 U.S. Code § 7001, Plaintiff "NEVER" consented to use of Plaintiff's signature in electronic or any form.

51. Wells Fargo, MERS and Ginnie Mae have all conspired and colluded to received unjust enrichments by setting up, signing (in Plaintiff name) and using the MERS Agreement without Plaintiff's consent or knowledge. The MERS Agreement is prima facia evidence of the identity theft and fraud committed by the above-named Defendants.

**B. Fraud by James Shrewsberry and Wells Fargo**

52. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

53. Chief Financial Officer James Shrewsberry and Wells Fargo are guilty of identity theft and fraud by use of the MERS Security Agreement to acquire undue enrichment from Plaintiff.

54. Defendants mailed Mr. Shrewsberry an instrument to pay the loan. Defendants mailed Plaintiff a letter verifying the debt had been discharged but later decided to steal the instrument and monetarily enrich themselves. (*See* Exhibit K)

55. Defendants failed to properly credit payments made by Plaintiff and foreclosed on the Subject Property based on Plaintiffs' alleged non-payment which Defendant knew to be false.

56. Defendants have concealed material facts known to them (but not to Plaintiff) regarding trusts, securities, payments, notices, assignments, transfers, late fees and charges with the intent to defraud Plaintiff. Defendants know the note was securitized and pooled into the GINNIE MAE REMIC TRUST 2012-129.

57. Defendants participation in the securitization scheme described herein have devised business plans to reap millions of dollars in profits at the expense of Plaintiff and other investors in the Ginnie Mae trust fund. This fraudulent scheme, was in fact a sham to use Plaintiff's interest in the real property to collect interest in excess of the legal rate. Plaintiff's

-14-

participation in the mortgage contract was procured by overt and covert misrepresentations and nondisclosures due to the fraudulent use of the MERS Agreement.

58.     Defendants agreed between and among themselves to engage in the conspiracy to defraud for the common purpose of accruing economic gains for themselves at the expense of and detriment to the Plaintiff. The actions of the Defendants were committed intentionally, willfully, wantonly, and with reckless disregard for the rights of the Plaintiff.

59.     Defendants enforced loan documents for which they had already been paid in full plus illegal fees for participating in an illegal scheme. These Defendants seek to add insult to injury by demanding ownership of the property in addition to the receipt of payment in full although no lawful delinquency or default has occurred.

60.     Defendants intentionally obfuscated the illegal allocation of payments, the failure to disclose payments, and the effect on the alleged obligation of the Plaintiff, to wit: despite numerous insurance products, credit default swaps, cross collateralization, over collateralization and polling at multiple levels, money received by some or all of these Defendants under the pretense of it being a "Mortgage Payment" was in fact retained, reserved, applied to non-performing loans to make them appear as though they were performing loans, or paid as fees to the enterprise Defendants described in this complaint.

61.     Defendants concealed the fact that the Loans were securitized as well as the terms of the Securitization Agreements, including, inter alia: (1) Financial Incentives paid; (2) existence of Credit Enhancement Agreements, and (3) existence of Acquisition Provisions. By concealing the securitization, Defendant concealed the fact that Borrower's loan changed in character inasmuch as no single party would hold the Note but rather the Notes would be included in a pool with other notes, split into tranches, and multiple investors would effectively

buy shares of the income stream from the loans. Changing the character of the loan in this way had a materially negative effect on Plaintiff that was known by Defendant but not disclosed. Defendant induce Plaintiff based on these misrepresentations and non-disclosures of the MERS Agreement.

62.     Defendants' failure to disclose the material terms of the transaction induced Plaintiff to enter into the loans and accept the Services as alleged herein. Defendants were aware of the misrepresentations and profited from them. Defendant knew or should have known that had the truth been disclosed, Plaintiff would not have entered into the Loans giving up all property and rights to the unknown MERS Agreement.

63.     As a direct and proximate result of the misrepresentations and concealment and since these illegal profits were never disclosed, Plaintiff is entitled to an accounting and a pro rata share of the profits obtained by the illegal, improper and undisclosed use of Plaintiffs' name, credit rating and identity. Plaintiff has been damaged in an amount to be proven at trial, including but not limited to Plaintiff loss of "all" rights, costs of Loan, damage to Plaintiff's financial security, emotional distress, and other fees incurred by Defendant's use of the MERS Agreement.

64.     Defendants are guilty of identity theft, malice, fraud, etc. and/or oppression. Defendants' actions were malicious and done willfully in conscious disregard of the rights and safety of Plaintiff in that the actions were calculated to steal from and injure Plaintiff. Based on the above, Wells Fargo lacked standing to bring an independent foreclosure action against the Plaintiff.

## C. Identity Theft and Fraud by Anselmo Lindberg & Associates

65. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

66. Anselmo Lindberg & Associates LLC (hereinafter refered to as "Anselmo") are a foreclosure mill debt collector who litigated against Plaintiff's registered business entity registered with the State of Missouri, registration number X001319462 and Minnesota Assumed Name, BEVERLY ANN YOUNG, file number 977095000021 without standing to do so.

67. Defendants did not have a valid bilateral contract with the BEVERLY ANN YOUNG registered business entity and therefore had no standing or jurisdiction to bring this case to Court and foreclose against the subject property.

68. Defendants have and still are committing intentional trespass, infringement, identity theft and unauthorized use of signature which equates to fraud. Defendant, Anselmo committed fraud when they filed a summons and complaint for Wells Fargo against Plaintiff for wrongful foreclosure. Anselmo was retained by Wells Fargo to protect the interest of the Ginnie Mae investors. Anselmo filed the Complaint against Plaintiff knowing that Wells Fargo is not the holder-in-due course as the Note has been converted and securitized into the GINNIE MAE REMIC TRUST 2012-129 and a fraudulent Assignment issued to Wells Fargo to foreclose on the mortgage.

69. Anselmo was mailed a Freedom of Information Request for Interrogatories and Freedom of Information Interrogatories Deposition and Discovery of Alleged Debt Collector/Creditors Disclosure Statement on October 12, 2016 requesting proof of the debt. (_See_ Exhibit L) Anselmo never responded to the request.

70.     Federal Rule of Civil Procedure 17 (a) (1) requires that an action must be prosecuted in the name of the real party in interest which is the GINNIE MAE REMIC TRUST 2012-129 which is not listed as the Plaintiff. The Defendant is committing fraud as he knows that Wells Fargo is the Servicer and not the true or real party in interest or the holders-in-due course. (See Jacobson, 402 B.R. 359, 365-66 (bankr. W.D. Wash. 2009)

71.     Defendants have committed fraud by unauthorized conversion of Plaintiff's signature and name to digital public/private PKI Key signatures and theft thereof.

72.     Defendants are committing theft of private properties, personal and intellectual properties, income concealed in IRS Tax Shelters and unauthorized manipulation of status, elections and subscriptions.

73.     Contracts to unlawful theft of estate (trusts) engineered by Anselmo with kickbacks to county/state actors and judges (all) springing from the intentionally concealed MERS/NB Agreement.

74.     Anselmo Lindberg & Associates LLC worked in collusion with and represented Wells Fargo in their foreclosure fraud. Anselmo is well aware of the fraud and identity theft committed by Wells Fargo and is hiding behind a confidentially clause for unjust enrichment and payment by Wells Fargo. Qui facit per alium facit per se, he who does anythng by another, does it himself. Therefore Anselmo is guilty of all charges relating to Wells Fargo.

75.     Anselmo Lindberg & Associates LLC who bear the title of "Esquire" are unregistered foreign agents lacking the capacity and competence to engage the Court in any manner with respect to Plaintiff. Further, all actions, pleadings, filings, arguments and orders are void for fraud based upon said undisclosed incapacity. A public official is a fiduciary toward the

public and if he deliberately conceals material information from them, he is guilty of fraud. McNally v United States 483 U.S. 350 (1987).

76.     The **title of Esquire is a title of nobility, which is strictly forbidden by the Constitution for the united States of America, making anyone who takes such a title a foreigner with respect to the Defendant, the State and this state. As a foreign agent, all judicial officers bearing the title of Esquire are required to register as a foreign agent under the Foreign Agents Registration Act, 22 U.S.C. §611,** *et seq* **(incorporated herein by this reference). Failure to register renders any actions taken with respect to Defendant void for lack of capacity and incompetence. As such, any actions taken to this point must be reversed and this case dismissed.** *See* **Judicial Notice of Incapacity, Abuse and Void Judgment that was ignored in the fraudulent foreclosure case.**

## SECOD CAUSE OF ACTION FOR
## WRONGFUL FORECLOSURE

77.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

78.     An actual controversy has arisen and now exists between Plaintiff and Defendants specified herein above, regarding their respective rights and duties, in that Plaintiff contends that Wells Fargo (or any other Defendant), does not have the right to foreclose on the Property because Wells Fargo (or any other Defendant), has failed to perfect any security interest in the Property, and cannot prove to the court they have a valid interest as a real party in interest. Thus, the purported power to foreclose judicially, by the above specified Defendants, and each of them, was a fraudulent and wrongful foreclosure.

79.     Plaintiff is informed and believes, and thereon alleges, that in order to conduct a foreclosure action, a person or entity must have standing. Wells Fargo did not have standing.

80.     Privity of contract is the traditional notion that there are two parties to a contract (when it fact there were more) and that only a party to the contract can enforce or renegotiate that contract. Plaintiff has no privity relationship withWells Fargo or Ginnie Mae. Wells Fargo has no cognizable connection to the note and therefore no privity relationship with Plaintiff. Wells Fargo has conducted a fraudulent foreclosure by creating a "record title" right to foreclose and, will hand the bag of stolen loot (Plaintiff's property) to Ginnie Mae.

81.     Wells Fargo gave no valuable consideration to Plaintiff relative to the mortgage and received no consideration from Plaintiff relative to the mortgage. Valuable consideration mean, and necessarily requires under every for and kind of purchase, something of actual value, capable, in estimation of the law, party with money. It is the passing of a consideration and not the form of the contract that in Equity passes title; and whatever th eform of the transaction, if no consideration passes, in equity no title passes. Plaintiff's promissory note paid the Sellers of the home which is why she was given a warranty deed from the sellers..

82.     The Note was never sold but pledged and the alleged loan which is "held for sale" meaning the Plaintiffs' collateral was put up as capital and sold in the market, on the DTC (Depository Trust Corporation) as ADR's or depository receipts at 105% full amortized value. This means that Wells Fargo, the Servicer did not have standing for foreclosure. Any debt the Plaintiff would have owed was thus eliminated, with credits due to the Plaintiff.

83.     Plaintiff "never" purchased a mortgage but was defrauded into signing a copyright derivative and Defendant is the holder of that copyright derivative. The Fannie/Freddie Standard Uniform Instrument is a copyrighted work of a computer program which becomes a derivative upon the borrowers signing of the undisclosed agreement. Defendants are unjustly enriching themselves many times over, selling an alleged mortgage loan

they do not even own by receiving future fees and compensation realized upon default with the actual first sale, which the Defendants collects on with the liquidation of the collateral. This is "ALL" fraud.

84.     Pursuant to Black's 1st volunteer in conveyance is one who holds a title under a voluntary conveyance, i.e., one made without consideration, good or vluable, to support it. Equity will not aid a volunteer. The court, upon its general principles, cannot complete what it finds imperfect and the Court of Equity will not make you a cestui que trust. Wells Fargo have no consideration and therefore is acting fraudulently to become a Trust Res. Again commtting fraud, concealment, conveyance and identity theft. Plaintiff has not knowingly imply to a trust or consent to one.

85.     Plaintiff was made reliant on false representations that the Ginnie Mae/Fannie/Freddie Standard Uniform Instrument was 'personal property' thereby a negotiable instrument. It is not a negotial instrument, it is a copyright DERIVATIVE which cannot be both a security and a negotiable instrument. Plaintiff was lured into executing what Plaintiff believed was a mortgage loan to real property (a negotiable instrument) but in fact was a collateralized copyright unknowingly giving uninformed consent to an installment lease to a future purchase. Plaintiff unknowingly signed a pre-securitized investment contract to which Plaintiff is the uninformed third-party beneficiary, creditor and entitlement holder. Defendants knew having control of the copyright derivative gave Defendants control of all of Plaintiff's real, personal and intellectual property which is more undisclosed fraud.

86.     Derivatives are credit default swaps, Collateralized Bond Obligations (CBO), CMO'S, CDO'S, CDO SQ., RMBS, MBS, ABS, and whatever other financially engineered

-21-

(patents and trademarks) Defendants can come up with. All stolen by use of the MERS Agreement.

87.     Plaintiff's mortgage/note was converted to DEPOSITS making Plaintiff a DEPOSITOR and not a MORTGAGOR. This was done without the consent of the Plaintiff and is fraud.

88.     Plaintiff was defrauded into a transaction Plaintiff didn't know existed and not given any documentation to show for it. MERS was essential in filling that void with the creation of fabricated written instruments that appear to be facially valid. All claims based on the validity of these MERS documents are fraud and false and if the documents and transaction tied to false claims of securitization was based on false and fraudulent documents, they are null and void. Fraud vitiates every transaction and all contracts.

89.     Soon after the origination of the fake loan, Plaintiff is informed and believes that Wells Fargo transferred all beneficial interest to private investors of the GINNIE MAE TRUST REMIC 2012-129.

90.     Plaintiff is informed and believes, and thereon alleges, that the Ginnie MaeTrust had no officers or directors and no continuing duties other than to hold assets and to issue the series of certificates of investment in mortgage backed securities as described in the Prospectus.

91.     Plaintiff is informed and believes and there upon allege that there is no one who has standing to foreclose as the chain of title was broken when converted to the GINNIE MAE REMIC TRUST 2012-129 and the Assignment made out to Wells Fargo to foreclose is fraudulent. (*See* Exhibit M)

92.     A year and a half after the Closing, Defendant drafted and caused to be executed by Stephanie Therese Tautges, a "robo-signer" for MERS, a fraudulent Assignment of Mortgage

and Note. The assignments did not take place at the time of economic transfer (i.e. sale of the note for equivalent value) to avoid separation of the note from the security instrument and the document appears to be effectively void and otherwise useless for the purpose of pursuing foreclosure. Stephanie Therese Tautges signed the Assignment as Assistant Secretary (an untruth) for MERS without disclosure of employment. Documents signed by Stephanie Therese Tautges attempted to assign the Mortgage to client Wells Fargo without an Assignor. This position of unilateral transfer is further strengthened by the fact that there is no evidence of verified proof of funds; a note endorsement; a bill of sale; a declaration of value; or transfer taxes as having been paid to Cook County Clerk "For Good and Valuable Consideration". The fraudulent Assignment of Mortgage was recorded with the Cook County Recorder of Deeds on February 28, 2014 as Document No. 4908027. Copies of Assignment showing different position are attached. (*See* Exhibit N)

93. This loan is not identified in any public reporting trust. "Guarantor – Ginnie Mae" is stated on the Mortgage Electronic Registration Systems, Inc. web site as "Investor", which indicates a current ownership interest of the FHA loan. A qualifying trust formed shortly after the execution of the loan on October 16, 2012 is the GINNIE MAE REMIC TRUST 2012-129 with a closing date of November 30, 2012. The underwriters are Barclays Capital Inc. and Loop Capital Markets LLC, the Sponsor is Ginnie Mae and Trustee is Wells Fargo Bank, NA. There is no known connection between the original lender, American Fidelity and Wells Fargo Bank, NA, to whom the fraudulent Assignment of Mortgage was assigned by an Assignee employee without disclosure of true role.

94. In furtherance of the fraud committed by Wells Fargo in the drafting and recording of the fraudulent Assignment of the Mortgage and Note, Defendant's MERS, Wells

Fargo and Anselmo Lindberg & Associates LLC, all individually named herein, caused a wrongful foreclosure action to be filed and litigated against Plaintiff. Said mortgage foreclosure action was initiated by Anselmo Lindberg & Associates LLC on behalf of Wells Fargo and not the GINNIE MAE REMIC TRUST 2012-129 in the Circuit Court of Cook County Illinois under Case No. 15 CH 009226 (hereinafter "Foreclosure Action").

95.     Plaintiff is further informed and believes and thereon alleges, that as a result of the misleading language intentionally placed in the Assignment of Mortgage and Note, Defendant's Wells Fargo and Anselmo Lindberg & Associates LLC, attorneys representing Wells Fargo, filed and fraudulently executed documents under and made certain oral representations to the Court, in furtherance of the fraud to gain possession and title to the subject property herein.

96.     The Mortgage Deed in itself does not attach to, nor does it create an enforceable right for Wells Fargo (and their Attorney) to enforce an action (foreclosure) against Plaintiff.

97.     Defendants hid the legal SEC filings, governing the transaction. In order to be controlled by those SEC filings, the true original loan Note and Mortgage had to be provided by the Document Custodian certified to have been in possession of them on or about November 30, 2012. Because it was not, the claim of ownership by the Trust cannot be substantiated and the loan servicing rights not established at law by agreement. This is why the GINNIE MAE REMIC TRUST 2012-129 is not listed in the IRS Publication 938 as a newly created REMIC in either the 2012 or 2013 Publication 938.

98.     In connection with the application for and consummation of the mortgage loan the subject of this action, Defendants agreed, between and among themselves, to engage in actions and a course of conduct designed to further an illegal act or accomplish a legal act by unlawful

means, and to commit one or more overt acts in furtherance of the conspiracy to defraud the Plaintiff.

## THIRD CAUSE OF ACTION FOR
## NEGLIGENCE

99.     Plaintiff re-alleges and incorporatess by reference all preceding paragraphs as though fully set forth herein.

100.    At all times relevant herein, Wells Fargo, acting as Plaintiffs' lender and loan servicer, had a duty to exercise reasonable care and skill to maintain proper and accurate loan records and to discharge and fulfil the other incidents attendant to the maintenance, accounting and servicing of loan records, including, but not limited, accurate crediting of payment made by Plaintiff.

101.    In taking the action alledged above, and in failing to take the actions as alleged above, Wells Fargo breached their duty of care and skill to Plaintiff in the servicing of Plaintiffs; loan by, among other things, failing to property and accurately credit payments made by Plaintiffs toward the loan, preparing and filing false documents, and foreclosing on the subject property without having the lawful authority and/or lawful documentation to do so.

102.    As a direct and promimate result of the negligence and carelessness of Wells Fargo as set forth above, Plaintiff suffered general and special damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION FOR
## UNJUST ENRICHMENT

103.    Plaintiff re-alleges and incorporatess by reference all preceding paragraphs as though fully set forth herein.

104.    By their wrongful acts and omissions, the Foreclosing Defendants have been unjustly enriched at the expense of Plaintiffs, and thus Plaintiffs have been unjustly deprived.

105. Defendants concealed the fact that the MERS Security Agreement was set-up in Plaintiff's name to received unjust enrichment from Plaintiff.

106. Defendants have also been additionally enriched through the receipt of PAYMENT from third parties including but not limited to investors, insurers, other borrowers, the United States Department of the Treasury, the United States Federal Reserve, and other unknow entities.

107. By reason of the foregoing, Plaintiffs seek restitution from the Foreclosing Defendants, and an order of this Court disgorging all profits, benefits, and other compensation obtained by the Foreclosing Defendants from their wrongful conduct.

## FIFTH CAUSE OF ACTION FOR
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

108. Plaintiff re-alleges and incorporatess by reference all preceding paragraphs as though fully set forth herein.

109. The actions of Defendants, as set forth herein, have resulted in the Plaintiff being threatened with the loss of the Property.

110. This outcome has been created without any right or privilege on the part of the Defendants, and, as such, their actions constitute outrageous or reckless conduct on the part of Defendants.

111. Defendant's fraud, identity theft, etc. was undertaken with the specific intent of inflicting emotional distress on the Plaintiff, such that Plaintiff would be so emotionally distressed and debilitated that he/she would be unable to exercise legal rights in the Property; the right to title of the Property, the right to cure the alleged default, right to verify the alleged debt that Defendants are attempting to collect, and right to clear title to the Property such that said title will regain its marketability and value.

112.    As a proximate cause of Defendants' conduct, Plaintiff has suffered severe emotional distress, experienced many sleepless nights due to anxiety, severe depression, lack of appetite, and loss of productivity as Plaintiff has been unable to find employment due to stress caused by Defendant.

113.    The conduct of Defendants, and each of them, as herein described, was so vile, base, contemptible, miserable, wretched, and loathsome that it would be looked down upon and despised by ordinary people. Plaintiff is therefore entitled to punitive damages in an amount appropriate to punish Defendants and to deter other from engaging in similar conduct.

## SIXTH CAUSE OF ACTION FOR
## SLANDER OF TITLE

114.    Plaintiff re-alleges and incorporatess by reference all preceding paragraphs as though fully set forth herein.

115.    Defendants, and each of them, disparaged Plaintiff's exclusive valid title by and through the preparing, posting, publishing, and recording of the documents previously described herein, including, but not limited to, the Notice of Default, Notice of Trustee's Sale, Trustee's Deed, and the documents evidencing the commencement of judicial foreclosure by a party who does not possess that right. These documents were naturally and commonly to be interpreted as denying, disparaging, and casting doubt upon Plaintiff's legal title to the Property. By posting, publishing, and recording said documents, Defendants' disparagement of Plaintiff's legal title was made pubic to the world at large.

116.    As a direct and proximate result of Defendants' conduct in publishing these documents, Plaintiff's title to the Property has been disparaged and slandered, and there is a cloud on Plaintiff's title, and Plaintiff has suffered, and continues to suffer, damages in an amount to be proved at trial.

117. At the time that the false and disparaging documents were created and published by the Defendants, Defendants knew the documents were false and created and published them with the malicious intent to injure Plaintiff and deprive Plaintiff of exclusive right, title, and interest in the Property, and to obtain the Property for their own use by unlawful means.

118. The conduct of the Defendants in publishing the documents described above was fraudulent, oppressive, and malicious. Therefore, Plaintiff is entitled to an award of punitive damages in an amount sufficient to punish Defendants for their malicious conduct and deter such misconduct in the future.

## SEVENTH CAUSE OF ACTION FOR QUIET TITLE

119. Plaintiff re-alleges and incorporatess by reference all preceding paragraphs as though fully set forth herein.

120. Plaintiffs is the equitable owner of the Subject Property which has the following legal description:

LOT 50 IN HUGUELET'S 7TH ADDITION TO SOUTH HOLLAND BEING A SUBDIVISION OF A PART OF THE NORTH ½ OF THE NORTHWEST ¼ OF SECTION 25, LYING EAST OF THE THREAD LINE OF THORN CREEK, ALL IN TOWNSHIP 36 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS
**COMMONLY KNOWN AS**: 1905 E. 172nd Street, South Holland Illinois 60473
**Tax Parcel Number**: 29-25-110-009-0000

121. Plaintiff's title to the above-described property is derived from the Warranty Deed from Kathrine Filipek and Daniel Cleve and recorded under Document # 1233816027. (_See_ Exhibit B)

122. On or about October 16, 2012, (hereinafter referred to as "Closing Date") Plaintiff entered into a consumer credit transaction with American Fidelity by obtaining what she thought was a mortgage loan secured by Plaintiff's principal residence (Subject Property) in favor of

American Fidelity, but with American Fidelity naming MERS as the mortgagee under the Security Instrument as it's "nominee."

123.    Plaintiffs seek to quiet title against the claims of Defendant, Wells Fargo; all persons unknown, claiming any legal or equtable right, title, estate, lien, or interest in the property described in the Complaint adverse to Plaintiff's Title, or any cloud on Plaintiff's title thereto.

124.    Defendant Wells Fargo, named herein, claims an interest in the Subject Property adverse to Plaintiff. Defendant asserts it is the owner and has a fraudulent Assignment to the Subject Property. Due to the fradulent Assignment, Wells Fargo is without any right whatsoever, and Defendant has no right estate, title, lien or interest in or to the property, or any part of the property.

125.    The claim of Defendant Wells Fargo, herein named, claim some estate, right, title, and lien or interest in or to the property adverse to plaintiff's title, and these claims constitute a cloud on plaintiff's title to the property.

126.    Wells Fargo and American Fidelity have received payment for the property numerous times and should reconvey the property. Wells Fargo as Trustee of the GINNIE MAE REMIC TRUST 2012-129 should surrender the Security Instrument and all notes evidencing debt secured by the Security Instrument to reconvey the Property without warranty to the Plaintiff who is legally entitled to it.

127.    Plaintiff requests the decree permanently enjoin defendants, and each of them, and all persons claiming under them, from asserting any adverse claim to Plaintiff's title to the property.

128.    Plaintiff request the court award Paintiff costs of this action, and such other relief as the court may deem proper.

## EIGHTH CAUSE OF ACTION FOR
## RICO

129.    Plaintiff re-alleges and incorporatess by reference all preceding paragraphs as though fully set forth herein.

130.    Defendants shared in the illegal proceeds of the transaction; conspired with each other to defraud the Plaintiff out of the proceeds of the loan; acted in concert to wrongfully deprive the Plaintiff of her residence; acted in concert and conspiracy to essentially steal the Plaintiff' home and/or convert the Plaintiff' home without providing Plaintiff reasonably equivalent value in exchange; and conducted an illegal enterprise within the meaning of the RICO statute.

## NINTH CAUSE OF ACTION FOR
## VIOLATION OF TILA AND HOEPA, 15 U.S.C. § 1601, ET. SEQ.

131.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

132.    Plaintiff alleges that the loan that is the subject matter of this complaint was and is a consumer-credit transaction within the meaning of TILA and HOEPA.

133.    The only party on record as mortgagee or beneficiary under a deed of trust has been paid in full as to principal, paid in full as to disclosed fees, and has received undisclosed fees as well because they were standing in for the real lender whose identity and existence was withheld from the borrower — all TILA violations.

134.    Any and all statute[s] of limitations relating to disclosures and notices required pursuant to 15 U.S.C. § 1601, et.seq. were tolled due to Defendants' failure to effectively provide the required disclosures and notices.

135. An actual controversy now exists between Plaintiff, who contends she has the right to rescind the loan on the Subject Property alleged in this Complaint, and based on information and belief, Defendants deny that right.

136. As a direct and proximate result of Defendants' violations Plaintiff has incurred and continue to incur damages in an amount according to proof but not yet ascertained including without limitation, statutory damages and all amounts paid or to be paid in connection with the transaction.

137. Defendants were unjustly enriched at the expense of Plaintiff who is therefore entitled to equitable restitution and disgorgement of profits obtained by Defendants.

138. Defendants' actions in this matter have been willful, knowing, malicious, fraudulent and oppressive, entitling Plaintiff to punitive damages in an amount appropriate to punish Defendants and to deter others from engaging in the same behavior.

139. On information and belief and given the volume of residential loan transactions solicited and processed by the Defendants, the Defendants have engaged in two or more instances of racketeering activity involving different victims but utilizing the same method, means, mode, operation, and enterprise with the same intended result.

140. Unreported repurchases of certificates or classes of certificates would and did result in a profit to the REMIC that went unreported, and which was not credited to Borrowers where the repurchase was, as was usually the case, the far less than the original investment.

141. Defendants shared in the illegal proceeds of the transaction; conspired with each other to defraud the Plaintiff out of the proceeds of the loan; acted in concert to wrongfully deprive the Plaintiff of the property; acted in concert and conspiracy to essentially steal the

property and/or convert the property without providing Plaintiff reasonably equivalent value in exchange; and conducted an illegal enterprise within the meaning of the RICO statute.

## TENTH CAUSE OF ACTION FOR
## VIOLATION OF RESPA, 1 U.S.C. § 2601 ET. SEQ.

142.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

143.    The loan to Plaintiff was a federally regulated mortgage loan as defined in RESPA.

144.    Housing and Urban Development's (HUD's) 1999 Statement of Policy established a two-part test for determining the legality of lender payments to mortgage brokers for table funded transactions and intermediary transactions under RESPA:

a)      Whether goods or facilities were actually furnished or services were actually performed for the compensation paid and;

b)      Whether the payments are reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed.

145.    In applying this test, HUD believes that total compensation should be scrutinized to assure that it is reasonably related to the goods, facilities, or services furnished or performed to determine whether it is legal under RESPA. The interest and income that Defendants have gained is disproportionate to the situation Plaintiff find themselves in due directly to Defendant's failure to disclose that they will gain a financial benefit while Plaintiff suffer financially as a result of the loan product sold to Plaintiff.

146.    Defendants violated RESPA because the payments between the Defendants were misleading and designed to create a windfall. T hese actions were deceptive, fraudulent and self-serving.

-32-

147.     As a proximate result of Defendants' actions, Plaintiff has been damages in an amount not yet ascertained, to be proven at trial.

## ELEVENTH CAUSE OF ACTION FOR:
## RESCISSION

148.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

149.     Plaintiff is entitled to rescind the loan and all accompanying loan documents for all of the foregoing reasons: 1) Identity Theft; 2) Copyright Infringement; TILA Violations; 3) Failure to provide a Mortgage Loan Origination Agreement; 4) Fraudulent Concealment; 5) Fraudulent Inducement; 6) failure to abide by the PSA; 7) making illegal or fraudulent transfers of the note and Mortgage/Deed of Trust; and 8) Public Policy Grounds, each of which provides independent grounds for relief.

150.     The Truth in Lending Act, 15 U.S.C §1601, et.seq. extends Plaintiff's right to rescind a loan to three years from the date of closing if the borrower received false or incomplete disclosures of either the loans terms or Borrower's right to rescind. Here, Defendants have failed to properly disclose the details of the loan. Specifically, the initial disclosures do not initial TILA disclosures, and lack of diligence and collusion on the part of the broker, lender and underwriter to place Plaintiff in a loan she could not afford and would ultimately benefit Defendants following the negative amortization that accrued.

151.     The public interest would be prejudiced by permitting the alleged contract to stand; such action would regard an unscrupulous lender.

152.     As a proximate result of Defendants' actions, Plaintiff has been damaged in an amount not yet ascertained, to be proven at trial.

153.     WHEREFORE, Plaintiff prays for rescission of the stated loan in its entirety.

## TWELFTH CAUSE OF ACTION FOR
## DECLARATORY RELIEF

154.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

155.     An actual controversy has arisen and now exists between Plaintiff and Defendants concerning their respective rights and duties regarding the Note and Mortgage/Trust Deed.

156.     Plaintiff contends that pursuant to the Loan, Defendants did not have authority to foreclose upon and sell the Property.

157.     Plaintiff therefore request a judicial determination of the rights, obligations and interest of the parties with regard to the Property, and such determination is necessary and appropriate at this time under the circumstances so that all parties may ascertain and know their rights, obligations and interests with regard to the Property.

158.     Plaintiff requests a determination of the validity of the Mortgage/Trust Deeds as of the date the Notes were assigned without a concurrent assignation of the underlying Trust Deeds.

159.     Plaintiff requests a determination of the validity of the Notice of Default.

160.     Plaintiff requests a determination of whether any Defendant has authority to foreclose on the Property.

161.     Plaintiff requests all adverse claims to the real property must be determined by a decree of this court.

162.     Plaintiff requests the decree declare and adjudge that Plaintiff is entitled to the exclusive possession of the property.

-34-

163.    Plaintiff requests the decree declare and adjudge that Plaintiff owns in fee simple, and is entitled to the quiet and peaceful possession of, the above-described real property.

164.    Plaintiff requests the decree declare and adjudge that Defendants, and each of them, and all persons claiming under them, have no estate, right, title, lien, or interest in or to the real property or any part of the property.

## PRAYER FOR RELIEF

**NOW COMES** Plaintiff praying the Court rules in Plaintiff's favor and for administrative, declaratory, injunctive and additional relief as equity may afford, and just remedy in the matter of identity theft, constructive fraud, collusion, fictitious debts, fictitious debt instruments, fictitious documents and fictitious claims by all Defendants and that the court rule in favor of the Plaintiff based on the evidence presented, and administrates/orders/decree that all Defendants are liable for all damages caused, and that compensation be immediately granted to the Plaintiff.

**WHEREFORE**, Plaintiff also prays that the court rules in favor of the Plaintiff and administrates/orders/decrees that since all gains were obtained unlawfully and fraud vitiates all contracts that all Defendants pay back all profits, gains, interest, securitized instruments, notes, and all real and personal property gained by the identity theft, fraud and collusion committed by all Defendants. Plaintiff request that this be done immediately with verified full accounting of all securities, bills of exchange, notes, or other instruments used in this matter. Plaintiff request that this case be dismissed with prejudice and request that "all" Defendants pay for each violation of identity theft, fraud or collusion and award Plaintiff such other and further relief as equity may require, including, but not limited to further declaratory and injunctive relief against

all Defendants. Plaintiffs pray for judgment against the Defendants and each of them, jointly and

severally, as follows:

    1.    For a declaration of the rights and duties of the parties, specifically that the

foreclosure of Plaintiffs' residence was wrongful.

    2.    For issuance of an Order canceling all Trustee's Deed.

    3.    To vacate the Trustee's Deed.

    4.    To quiet title in favor of Plaintiff and against Defendants.

    5.    For "All" Causes of Action (1 through 11) to be awarded as follows:

        a.  Compensatory, special, and general damages, in an amount to be determined
            by proof at trial;

        b.  For Punitive damages and restitution as allowed by law;

        c.  For Costs of this action;

    6.    For Declaratory Relief, including but not limited to the following Decrees of this

Court that:

        a.  Plaintiff is the prevailing party;

        b.  The Trustees of the Trusts have no enforceable secured or unsecured claim
            against the Property;

        c.  The Sponsor has no enforceable secured or unsecured claim against the
            Property;

        d.  The Depositor has no enforceable secured or unsecured claim against the
            Property;

        e.  The Mortgage Originator has no enforceable secured or unsecured claim
            against the Property;

        f.  Determines all adverse claims to the real property in this proceeding;

        g.  Plaintiff is entitled to the exclusive possession of the property;

        h.  Plaintiff owns in fee simple, and is entitled to the quiet and peaceful
            possession of, the above-described real property.

i.  Defendants, and each of them, and all persons claiming under them, have no estate, right, title, lien, or interest in or to the real property or any part of the property.


beverly-ann :jones-young, Grantor
1905 E. 172nd Street
South Holland, Illinois [60473]
(708) 560-3698

201801298

Clerk: Please File and Record

**RECORDING PREPARED & REQUESTED BY:**
:beverly-ann :jones-young

**AFTER RECORDING MAIL TO:**
Prepared By:

**Name:** :beverly-ann :jones-young

**Mailing Location:** c/o 1905 E. 172nd Street
South Holland, Illinois Republic] near [60473-3727]
Non-Domestic without the U.S
Use the above mailing location **EXACTLY AS PRINTED**

LORI GADBOIS
RECORDER
KANKAKEE COUNTY, IL
RECORDED ON
02/07/2018    01:48:29PM

REC FEE:  47.00
PAGES: 9

**SPACE HERE ABOVE FOR RECORDERS USE ONLY**

| **MAIL STATEMENTS TO:** | c/o 1905 E. 172nd Street, South Holland, Illinois Republic] near [60473-3727] Non-Domestic without the U.S. |
|---|---|
| :beverly-ann :jones-young | |

# *ASSUMED NAME CERTIFICATES*

Exhibit A



**Work Item 977095000021**
**Original File Number 977095000021**

STATE OF MINNESOTA
OFFICE OF THE SECRETARY OF STATE
FILED
**10/31/2017 11:59 PM**

Steve Simon

Steve Simon
Secretary of State

# Office of the Minnesota Secretary of State

**Certificate of Assumed Name**

*Minnesota Statutes, Chapter* 333

The filing of an assumed name does not provide a user with exclusive rights to that name. The filing is required for consumer protection in order to enable customers to be able to identify the true owner of a business.



ASSUMED NAME: **BEVERLY ANN YOUNG**

PRINCIPAL PLACE OF BUSINESS: **1905 E. 172nd Street South Holland IL 60473 united states of America**

NAMEHOLDER(S):

Name:

**Young, Beverly Ann**

Address:

**1905 E. 172nd Street South Holland IL 60473 united states of America**

If you submit an attachment, it will be incorporated into this document. If the attachment conflicts with the information specifically set forth in this document, this document supersedes the data referenced in the attachment.

*By typing my name, I, the undersigned, certify that I am signing this document as the person whose signature is required, or as agent of the person(s) whose signature would be required who has authorized me to sign this document on his/her behalf, or in both capacities. I further certify that I have completed all required fields, and that the information in this document is true and correct and in compliance with the applicable chapter of Minnesota Statutes. I understand that by signing this document I am subject to the penalties of perjury as set forth in Section 609.48 as if I had signed this document under oath.*

SIGNED BY: **Young, Beverly Ann CEO dba BEVERLY ANN YOUNG**

MAILING ADDRESS: **None Provided**

EMAIL FOR OFFICIAL NOTICES: **happy.girl2@aol.com**

## Office of the Minnesota Secretary of State
### Certification of Record

I, Steve Simon, Secretary of State of Minnesota, do certify that: The filing(s) listed below were filed in the Minnesota computerized/central filing system on the date(s) listed below and that the copies associated with this certification are a true and complete copy of those filings as filed in that system.

**Filing(s) filed on:**

| **Filing Date** | **Filing Type** | **Filing Number** |
| --- | --- | --- |
| 10/31/2017 | Original Filing - Assumed Name | 977095000021 |

This certificate has been issued on: 10/31/2017



*Steve Simon*

Steve Simon
Secretary of State
State of Minnesota

# Affidavit of Publication

**CERTIFICATE OF
ASSUMED NAME
STATE OF MINNESOTA**

Minnesota Statutes, Chapter 333
The filing of an assumed name does
not provide a user with exclusive rights
to that name. The filing is required for
consumer protection in order to enable
customers to be able to identify the true
owner of a business.
Assumed Name:
BEVERLY ANN YOUNG
Principal Place of Business: 1905 E.
172nd Street, South Holland, IL 60473
united states of America
Nameholder(s): Young, Beverly Ann,
1905 E. 172nd Street, South Holland, IL
60473 united states of America
By typing my name, I, the
undersigned, certify that I am signing
this document as the person whose
signature is required, or as agent of the
person(s) whose signature would be
required who has authorized me to sign
this document on his/her behalf, or in
both capacities. I further certify that I
have completed all required fields, and
that the information in this document is
true and correct and in compliance with
the applicable chapter of Minnesota
Statutes. I understand that by signing
this document I am subject to the
penalties of perjury as set forth in
Section 609.48 as if I had signed this
document under oath.
Signed by: Young, Beverly Ann CEO dba
BEVERLY ANN YOUNG
(November 3, 4, 2017)    11435153

STATE OF MINNESOTA )
                   (SS.
COUNTY OF HENNEPIN )

**Description:**
BEVERLY ANN YOUNG

Disa McClellan , being duly sworn on oath say she/he is and
during all times herein stated has been the publisher or the publishers designated
agent in charge of the newspaper known as

## Finance and Commerce (MN)
### 222 South 9th St, Suite 2300, Minneapolis, MN 55402

and has full knowledge of the facts herein stated as follows:
(A) The newspaper has complied with all of the requirements to constitute a
qualified newspaper under Minnesota law, including those requirements found in
Minnesota Statute Section 331A.02...
(B) She/He further states on that the printed

| New Business Names Entities |
| --- |
| 11435153 |

hereto printed as it was printed and published there in the English language; that
it was first so published on

November 03, 2017 for      2      time(s):
the subsequent dates of publications being as follows:

Fri, November 3, 2017     Sat, November 4, 2017

And that the following is a printed copy of the lower case alphabet from A to Z,
both inclusive, and is hereby acknowledged as being the size and kind of type
used in the composition and publication of said notice, to wit:

      X       abcdefghijklmnopqrstuvwxyz
                    abcdefghijklmnopqrstuvwxyz

Mortgage Foreclosure Notices (effective 7/1/2015). Pursuant to Minnesota Statutes §580.033
relating to the publication of mortgage foreclosure notices: The newspaper's known office of
issue is located in Hennepin County. The newspaper complies with the conditions described
in §580.033, subd. 1, clause (1) or (2). If the newspaper's known office of issue is located in
the county adjoining the county where the mortgaged premises or some part of the mortgaged
premises described in the notice are located, a substantial portion of the newspaper's
circulation is in the latter county.

Subscribed and
Sworn to before me this 4th    day of November, 2017

(Notarial Seal)    Notary Public, Hennepin County, Minnesota

**ALYSSA ERIN FRIEDRICH**
NOTARY PUBLIC - MINNESOTA
My Commission Expires
January 31, 2022

### RATE INFORMATION:

| | | |
| --- | --- | --- |
| 1. Lowest classified rate paid by commercial users for comparable space: | $ | 16.0000 |
| 2. Maximum rate allowed by law for the above matter: | $ | 0.85800 |
| 3. Rate actually charged for the above matter: | $ | 0.7800 |

## Office of the Minnesota Secretary of State
## Certificate of Existence and Registration

I, Steve Simon, Secretary of State of Minnesota, do certify that: The entity listed below was filed under the chapter of Minnesota Statutes listed below with the Office of the Secretary of State on the date listed below and that this entity or filing is registered at the time this certificate has been issued.

| | |
|---|---|
| Name: | BEVERLY ANN YOUNG |
| Date Filed: | 10/31/2017 |
| File Number: | 977095000021 |
| Minnesota Statutes, Chapter: | 333 |
| Home Jurisdiction: | Minnesota |

This certificate has been issued on: 11/01/2017



Steve Simon
Secretary of State
State of Minnesota



**State of Missouri**
John R. Ashcroft, Secretary of State
Corporations Division
PO Box 778 / 600 W. Main St., Rm. 322
Jefferson City, MO 65102

X001319462
**Date Filed: 4/11/2018**
**Expiration Date: 4/11/2023**
**John R. Ashcroft**
**Missouri Secretary of State**

# Registration of Fictitious Name

*(Submit with filing fee of $7.00)*
*(Must be typed or printed)*

This information is for the use of the public and gives no protection to the name being registered. There is no provision in this Chapter to keep another person or business entity from adopting and using the same name. The fictitious name registration expires 5 years from the filing date. (Chapter 417, RSMo)

**Please check one box:**

☒ New Registration    ☐ Renewal _____    ☐ Amendment _____    ☐ Correction _____
                                  *Charter number*              *Charter number*                  *Charter number*

**The undersigned is doing business under the following name and at the following address:**

Business name to be registered:    BEVERLY ANN JONES

Business Address:    c/o 1905 E 172nd Street
                      *(PO Box may only be used in addition to a physical street address)*

City, State and Zip Code:    South Holland, IL  60473

**Owner Information:**

If a business entity is an owner, indicate business name and percentage owned. If all parties are jointly and severally liable, percentage of ownership need not be listed. Please attach a separate page for more than three owners. The parties having an interest in the business, and the percentage they own are:

| Name of Owners, Individual or Business Entity | Charter # Required If Business Entity | Street and Number | City and State | Zip Code | If Listed, Percentage of Ownership Must Equal 100% |
|---|---|---|---|---|---|
| jones, beverly ann | | c/o 1905 E 172nd Street | South Holland, IL | 60473 | |

**All owners must affirm by signing below**
In Affirmation thereof, the facts stated above are true and correct:
(The undersigned understands that false statements made in this filing are subject to the penalties of a false declaration under Section 575.060 RSMo)

| beverly ann jones | BEVERLY ANN JONES | 04/11/2018 |
|---|---|---|
| *Owner's Signature or Authorized Signature of Business Entity* | *Printed Name* | *Date* |

Name and address to return filed document:

Name:    young ann beverly

Address:    Email: happygirl@email.com

City, State, and Zip Code:

Corp. 56 (09/2010)



**Certified Forensic Loan Auditors**

**(To Multifamily Base Offering Circular dated October 1, 2011)**



## $829,795,263 •

## Government National Mortgage Association

# GINNIE MAE®

### Guaranteed REMIC Pass-Through Securities and MX Securities
### Ginnie Mae REMIC Trust 2012-129



# Barclays Capital Inc.



## Loop Capital Markets, LLC

#### The date of this Offering Circular Supplement is November 20, 2012.

The document is not available on the SEC web site. Following this section would normally be the "Assignment of Mortgage" type section of the Prospectus Supplement; but this security has no such verbiage. Furthermore, there is no pooling and servicing agreement (PSA) that is publically available. Thus, extracts of the "Conveyance of Loans" type section (normally Section 2.01) from any such PSA is not available.

**CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016**
-All Rights Reserved-

11 Exhibit B "



**Certified Forensic Loan Auditors**

# MORTGAGE ELECTRONIC REGISTRATION SYSTEMS (MERS) ANALYSIS

- The Mortgage shows a MIN number of 1003940-1080019454-1 and the MERS SERVICER ID website https://www.mers-serviceid.org/sis/search indicates that the loan is serviced by Wells Fargo Home Mortgage, a division of Wells Fargo Bank NA and "Guarantor - Ginnie Mae" is stated as investor.



### The Mortgage Industry's Utility

**1 record matched your search:**

Need help? ❓

MIN: **1003940-1080019454-1**     Note Date: **10/16/2012**     MIN Status: **Inactive**

Servicer: Wells Fargo Home Mortgage, a division of Wells Fargo Bank NA     Phone: **(651) 605-3711**
**Minneapolis, MN**

If you are a borrower on this loan, you can click here to enter additional information and display the Investor name.

Return to Search

For more information about Mortgage Electronic Registration Systems, Inc. (MERS) please go to www.mersinc.org

Select borrower type and enter borrower information to see Investor for MIN 1003940-1080019454-1.

- **Investor for Individual Borrower**

Your entries may be either upper or lower case.

Fields marked ★ are required.

Last Name: young ★

SSN: ___ - ___ - ___ ★

By checking this box, the borrower or borrower's authorized representative is attesting to the fact that he or she is in fact the borrower or borrower's authorized representative for the loan in question. Additionally, borrowers wishing to learn the identity of their loan's investor must confirm their identity by entering their last name or corporation name as well as their SSN or TIN. If this information does not match the information contained in the MERS® System for the borrower of the loan, the investor information will not be displayed. Borrowers should verify the results with their loan servicer. ★

Submit

**Investor for Corporation/Non-Person Entity Borrower**

Servicer: Wells Fargo Home Mortgage, a division of Wells Fargo Bank NA     Phone: **(651) 605-3711**
**Minneapolis, MN**

Investor: **Guarantor - Ginnie Mae**

## SECURITIZING A LOAN
CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016
-All Rights Reserved-

# WARRANTY DEED

MAIL TO: —

MS. BEVERLY A. YOUNG
1905 E. 172 ND STREET
SOUTH HOLLAND, ILLINOIS 60473

NAME AND ADDRESS OF
TAXPAYER:
Beverly Young
1905 E. 172nd Street
South Holland, IL 60473



Doc#: 1233816027 Fee: $42.00
Karen A. Yarbrough RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 12/03/2012 11:28 AM Pg: 1 of 3

RECORDER'S STAMP

THE GRANTOR(S) Katherine Filipek, married to John Filipek, 5741 S. Nagle Avenue, Chicago, IL 60638, and Daniel Cleve, a single man, 518 W. Norris Drive, Ottawa, IL 61350, for and in consideration of TEN DOLLARS and other good and valuable considerations in hand paid, CONVEY AND WARRANT to Beverly Young, 1905 E. 172nd Street, South Holland, IL 60473, all interest in the following described Real Estate in the County of Cook, in the State of Illinois, to wit:

**LOT 50 IN HUGUELET'S 7TH ADDITION TO SOUTH HOLLAND BEING A SUBDIVISION OF A PART OF THE NORTH 1/2 OF THE NORTHWEST 1/4 OF SECTION 25, LYING EAST OF THE THREAD LINE OF THORN CREEK, ALL IN TOWNSHIP 36 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.**

Permanent Index Number(s): 29-25-110-009-0000
Property Address: 1905 East 172nd Street, South Holland, IL 60473

hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois.

TO HAVE AND TO HOLD said premises.

This property is not the homestead property of the grantors.

DATED: October 16, 2012

KATHERINE FILIPEK

DANIEL CLEVE

| REAL ESTATE TRANSFER | 12/03/2012 |
| --- | --- |
| COOK | $45.00 |
| ILLINOIS: | $90.00 |
| TOTAL: | $135.00 |

29-25-110-009-0000 | 20121001603108 | V036U2

Exhibit C

**STATE OF ILLINOIS** )
**County of COOK** )

I, the undersigned, a Notary Public in and for said county, in the State aforesaid, DO HEREBY CERTIFY THAT Katherine Filipek, married to John Filipek, and Daniel Cleve, a single man, personally known to me to be the same persons whose names our subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that they signed, sealed and delivered the said instrument as their free and voluntary act, for the uses and purposes therein set forth, including the release and waiver of the right of homestead.

Given under my hand and notarial seal, this 16th day of October, 2012.

_____
Notary Public

OFFICIAL SEAL
VINCENT F GIULIANO
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:01/15/14
IMPRESS SEAL HERE

NAME AND ADDRESS OF PREPARER:
Vincent F. Giuliano
Attorney At Law
7222 West Cermak Road, Suite 300
North Riverside, IL 60546



Attachment

D

MRD 8-10-98

| FORM PTO-1618A<br>Expires 06/30/99<br>OMB 0651-0027 | 08-27-1998 | U.S. Department of Commerce<br>Patent and Trademark Office<br>**TRADEMARK** |

|||||||||||| (barcode)

100804608

**RECORDATION FORM COVER SHEET**

**TRADEMARKS ONLY**

U.S. Patent & TMOfc/TM Mail Rcpt Dt. #70

||||||||||||| (barcode)

08-10-1998

TO: The Commissioner of Patents and Trademarks: Please record the attached original document(s) or copy(ies).

## Submission Type

- [x] **New**
- [ ] **Resubmission (Non-Recordation)**
  Document ID #
- [ ] **Correction of PTO Error**
  Reel # [ ] Frame # [ ]
- [ ] **Corrective Document**
  Reel # [ ] Frame # [ ]

## Conveyance Type

- [ ] **Assignment**
- [ ] **License**
- [x] **Security Agreement**
- [ ] **Nunc Pro Tunc Assignment**
  Effective Date
  Month Day Year
- [ ] **Merger**
- [ ] **Change of Name**
- [ ] **Other**

## Conveying Party

[ ] Mark if additional names of conveying parties attached

Execution Date
Month Day Year
| 06 | 30 | 98 |

**Name** Mortgage Electronic Registration Systems, Inc.

**Formerly**

[ ] **Individual** [ ] **General Partnership** [ ] **Limited Partnership** [x] **Corporation** [ ] **Association**

[ ] **Other**

[x] **Citizenship/State of Incorporation/Organization** Delaware

## Receiving Party

[ ] Mark if additional names of receiving parties attached

**Name** NationsBank, N.A.

**DBA/AKA/TA**

**Composed of**

**Address (line 1)** 8300 Greensboro Drive

**Address (line 2)** Suite 550

**Address (line 3)** McLean | VA | 22102
City | State/Country | Zip Code

[ ] **Individual** [ ] **General Partnership** [ ] **Limited Partnership** | If document to be recorded is an assignment and the receiving party is not domiciled in the United States, an appointment of a domestic representative should be attached. (Designation must be a separate document from assignment.)

[ ] **Corporation** [ ] **Association**

[x] **Other** National Banking Association

[x] **Citizenship/State of Incorporation/Organization** U.S.

## FOR OFFICE USE ONLY

Public burden reporting for this collection of information is estimated to average approximately 30 minutes per Cover Sheet to be recorded, including time for reviewing the document and gathering the data needed to complete the Cover Sheet. Send comments regarding this burden estimate to the U.S. Patent and Trademark Office, Chief Information Officer, Washington, D.C. 20231 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Paperwork Reduction Project (0651-0027), Washington, D.C. 20503. See OMB Information Collection Budget Package 0651-0027, Patent and Trademark Assignment Practice. DO NOT SEND REQUESTS TO RECORD ASSIGNMENT DOCUMENTS TO THIS ADDRESS.

**Mail documents to be recorded with required cover sheet information to:**
**Commissioner of Patents and Trademarks, Box Assignments, Washington, D.C. 20231**

Exhibit D

FORM PTO-1618B
Expires 06/30/99
OMB 0651-0027

**Page 2**

U.S. Department of Commerce
Patent and Trademark Office
**TRADEMARK**

## Domestic Representative Name and Address
Enter for the first Receiving Party only.

**Name**

**Address (line 1)**

**Address (line 2)**

**Address (line 3)**

**Address (line 4)**

## Correspondent Name and Address
Area Code and Telephone Number (757) 518-3206

**Name** R. Joel Ankney

**Address (line 1)** P.O. Box 61185

**Address (line 2)** Virginia Beach, VA 23466-1185

**Address (line 3)**

**Address (line 4)**

**Pages** Enter the total number of pages of the attached conveyance document including any attachments. # 18

## Trademark Application Number(s) or Registration Number(s)
☐ Mark if additional numbers attached

Enter either the Trademark Application Number or the Registration Number (DO NOT ENTER BOTH numbers for the same property).

| Trademark Application Number(s) | | | Registration Number(s) | | |
|---|---|---|---|---|---|
| | | | 2084831 | | |
| | | | | | |
| | | | | | |

**Number of Properties** Enter the total number of properties involved. # 1

**Fee Amount** Fee Amount for Properties Listed (37 CFR 3.41): $ 40.00

**Method of Payment:** Enclosed [X] Deposit Account ☐

**Deposit Account**
(Enter for payment by deposit account or if additional fees can be charged to the account.)
**Deposit Account Number:** #

Authorization to charge additional fees: Yes ☐ No ☐

## Statement and Signature

*To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document. Charges to deposit account are authorized, as indicated herein.*

R. Joel Ankney
**Name of Person Signing**

*R. Joel Ankney* (signature)
**Signature**

August 6, 1998
**Date Signed**

*Intentional Omission of US Registered TRADE/SERVICE MARK - Violation of Lanham Act* (handwritten, highlighted)

Int. Cl.: 36

Prior U.S. Cls. 100, 101, and 102

United States Patent and Trademark Office

Reg. No. 2,084,331
Registered July 29, 1997

## SERVICE MARK
## PRINCIPAL REGISTER

### MERS

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (DELAWARE CORPORATION)
1595 SPRING HILL RD.
VIENNA, VA 22182

FOR: REAL ESTATE DATABASE SERVICES, NAMELY, PROVIDING AND MAINTAINING A REGISTRY OF THE TRANSFER OF MORTGAGE SERVICING RIGHTS, MORTGAGE OWNERSHIP, SECURITY INTERESTS IN

MORTGAGES AND THE RELEASE OF MORTGAGES FOR USE BY THOSE IN THE MORTGAGE BANKING INDUSTRY, IN CLASS 36 (U.S. CLS. 100, 101 AND 102).

FIRST USE 2-1-1996; IN COMMERCE 2-1-1996.

SN 75-091,395, FILED 11-21-1996.

RICHARD KIM, EXAMINING ATTORNEY

## SECURITY AGREEMENT

This SECURITY AGREEMENT (as amended, supplemented or modified from time to time, this "Security Agreement") is dated as of June 30, 1998 and is between MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., a Delaware corporation (the "Borrower"), and NATIONSBANK, N.A., a national banking association (the "Bank").

The Borrower and the Bank propose to enter into a Secured Credit Agreement dated as of June 30, 1998 (as the same may be amended, supplemented or modified from time to time and including any agreement extending the maturity of, refinancing or otherwise restructuring all or any portion of the Obligations under such Agreement or any successor agreement, the "Credit Agreement"). To induce the Bank to enter into the Credit Agreement and to secure its obligations thereunder and hereunder, the Borrower hereby agrees with the Bank as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1. **Defined Terms.** As used in this Security Agreement, terms defined in the Credit Agreement shall have their defined meanings when used herein, and the following terms shall have the following meanings:

"Account Debtor" means, with respect to any Receivable or Other Intangible, any Person obligated to make payment thereunder, including without limitation any account debtor thereon.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of the Commonwealth of Virginia.

"Collateral" has the meaning assigned to it in Section 2.1 of this Security Agreement.

"Equipment" means all equipment now owned or hereafter acquired by the Borrower, including all items of machinery, equipment, furnishings and fixtures of every kind, whether affixed to real property or not, as well as all automobiles, trucks and vehicles of every description, trailers, handling and delivery equipment, all additions to, substitutions for, replacements of or accessions to any of the foregoing, all attachments, components, parts (including spare parts) and accessories whether installed thereon or affixed thereto and all fuel for any thereof.

"Inventory" means all inventory now owned or hereafter acquired by the Borrower, including (i) all goods and other personal property which are held for sale or lease or are furnished or are to be furnished under a contract of service or which constitute raw materials, work in process or materials used or consumed or to be used or consumed in the Borrower's business, (ii) all inventory, wherever located, evidenced by negotiable and non-negotiable documents of title, warehouse receipts and bills of lading, (iii) all of the Borrower's rights in, to and under all purchase orders now owned or hereafter received or acquired by it for goods or services and (iv) all rights of the Borrower as an unpaid seller, including rescission, replevin, reclamation and stopping in transit.

"License" means, with respect to any Patent, any agreement granting any right to practice any invention covered by any Patent and, with respect to any Trademark, any agreement granting any right to use any Trademark, and "Licenses" means all of such Licenses.

"Obligations" means (i) all amounts now or hereafter payable by the Borrower to the Bank on the Note, (ii) all other obligations or liabilities now or hereafter payable by the Borrower pursuant to the Credit Agreement, (iii) all obligations and liabilities now or hereafter payable by the Borrower under, arising out of or in connection with this Security Agreement or any other Loan Document and (iv) all other indebtedness, obligations and liabilities of the Borrower to the Bank, now existing or hereafter arising or incurred, whether or not evidenced by notes or other instruments, and whether such indebtedness, obligations and liabilities are direct or indirect, fixed or contingent, liquidated or unliquidated, due or to become due, secured or unsecured, joint, several or joint and several, related or unrelated to the Loans, similar or dissimilar to the indebtedness arising out of or in connection with the Credit Agreement or of the same or a different class of indebtedness as the

-1-

TRADEMARK
REEL: 1773 FRAME: 0951

indebtedness arising out of or in connection with the Credit Agreement, including, without limitation, any overdrafts in any deposit accounts maintained by the Borrower with the Bank, all obligations of the Borrower with respect to letters of credit, if any, issued by the Bank for the account of the Borrower, any indebtedness of the Borrower that is purchased by or assigned to the Bank and any indebtedness of the Borrower to any assignee of all or a portion of the Notes or any other obligation referred to in this definition.

"Other Intangibles" means all accounts, accounts receivable, contract rights, documents, instruments, chattel paper, money and general intangibles now owned or hereafter acquired by the Borrower including, without limitation, all customer lists, permits, federal and state tax refunds, reversionary interests in pension plan assets, Trademarks, Patents, Licenses, copyrights and other rights in intellectual property, other than Receivables.

"Patent" means all letters patent of the United States or any other county, and all applications for letters patent of the United States or any other county, in which the Borrower may now or hereafter have any right, title or interest and all reissues, continuations, continuations-in-part or extensions thereof.

"Proceeds" means all proceeds, including (i) whatever is received upon any collection, exchange, sale or other disposition of any of the Collateral and any property into which any of the Collateral is converted, whether cash or non-cash, (ii) any and all payments or other property (in any form whatsoever) made or due and payable on account of any insurance, indemnity, warranty or guaranty payable to the Borrower with respect to any of the Collateral, (iii) any and all payments (in any form whatsoever) made or due and payable in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental body, authority, bureau or agency (or any person, corporation, agency, authority or other entity acting under color of any governmental authority), (iv) any claim of the Borrower against third parties for past, present or future infringement of any Patent or for past, present or future infringement or dilution of any Trademark or for injury to the goodwill associated with any Trademark or for the breach of any License and (v) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"Real Estate" means all real property and all buildings, plants, furnishing or fixtures or other improvements to or construction on real property now owned or hereafter acqfired by the Borrower, and all leasehold interests now owned or hereafter acquired by the Borrower in real property.

"Receivables" means all accounts now or hereafter owing to the Borrower, and all accounts receivable, contract rights, documents, instruments or chattel paper representing amounts payable or monies due or to become due to the Borrower, arising from the sale of Inventory or the rendition of services in the ordinary course of business or otherwise (whether or not earned by performance), together with all Inventory returned by or reclaimed from customers wherever such Inventory is located, and all guaranties, securities and liens held for the payment of any such account, account receivable, contract right, document, instrument or chattel paper.

"Trademark" means all right, title or interest which the Borrower may now or hereafter have in any or all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos, other source of business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registration and recordings thereof and all applications in connection therewith, including without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or political subdivision thereof and all reissues, extensions or renewals thereof.

"UCC" means at any time the Uniform Commercial Code as the same may from time to time be in effect in the Commonwealth of Virginia, provided that, if, by reason of mandatory provisions of law, the validity or perfection of any security interest granted herein is governed by the Uniform Commercial Code as in effect in a jurisdiction other than Virginia then, as to the validity or perfection of such security interest, "UCC" shall mean the Uniform Commercial Code in effect in such other jurisdiction.

-2-

**Section 1.2. UCC Definitions.** The uncapitalized terms "account", "account debtor", "chattel paper", "contract right", "document", "warehouse receipt", "bill of lading", "document of title", "instrument", "inventory", "equipment" "general intangible", "money", "proceeds" and "purchase money security interest" as used in Section 1.1 or elsewhere in this Agreement have the meanings of such terms as defined in the UCC.

**ARTICLE II**
**SECURITY INTERESTS**

**Section 2.1. Grant of Security Interests.** To secure the due and punctual payment of all Obligations, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing or due or to become due, in accordance with the terms thereof and to secure the due and punctual performance of all of the obligations of the Borrower contained in the Credit Agreement and in the other Loan Documents to which it is a party and in order to induce the Bank to enter into the Credit Agreement and make the loans provided for therein in accordance with the terms thereof, the Borrower hereby grants to the Bank a security interest in all of the Borrower's right, title and interest in, to and under the following, whether now existing or hereafter acquired (all of which are herein collectively called the "Collateral"):

       (i) all Receivables;

       (ii) all Other Intangibles;

       (iii) all Equipment;

       (iv) all Inventory;

       (v) to the extent not included in the foregoing, all other personal property, whether tangible or intangible, and wherever located, including, but not limited to, the balance of every deposit account now or hereafter existing of the Borrower with any bank and all monies of the Borrower and all rights to payment of money of the Borrower;

       (vi) to the extent not included in the foregoing, all books, ledgers and records and all computer programs, tapes, discs, punch cards, data processing software, transaction files, master files and related property and rights (including computer and peripheral equipment) necessary or helpful in enforcing, identifying or establishing any item of Collateral; and

       (vii) to the extent not otherwise included, all Proceeds and products of any or all of the foregoing, whether existing on the date hereof or arising hereafter.

**Section 2.2. Continuing Liability of the Borrower.** Anything herein to the contrary notwithstanding, the Borrower shall remain liable to observe and perform all the terms and conditions to be observed and performed by it under any contract, agreement, warranty or other obligation with respect to the Collateral, and shall do nothing to impair the security interests herein granted. The Bank shall not have any obligation or liability under any such contract, agreement, warranty or obligation by reason of or arising out of this Security Agreement or the receipt by the Bank of any payment relating to any Collateral, nor shall the Bank be required to perform or fulfill any of the obligations of the Borrower with respect to the Collateral, to make any inquiry as to the nature or sufficiency of any payment received by it or the sufficiency of the performance of any party's obligations with respect to any Collateral. Furthermore, the Bank shall not be required to file any claim or demand to collect any amount due or to enforce the performance of any party's obligations with respect to, the Collateral.

-3-

All fabricated to intentionally deceive to keep WE THE PEOPLE ignorant and incompetent

### Section 2.3. Sales and Collections.

(a)  The Borrower is authorized (i) to sell in the ordinary course of its business for fair value and on an arm's-length basis any of its Inventory normally held by it for such purpose and (ii) to use and consume, in the ordinary course of its business, any raw materials, supplies and materials normally held by it for such purpose. The Bank may upon the occurrence of any Event of Default, without cause or notice, curtail or terminate such authority at any time.

(b)  The Borrower is authorized to collect amounts owing to it with respect to the Collateral. However, the Bank may at any time, upon the occurrence of a Default, notify Account Debtors obligated to make payments under any or all Receivables or Other Intangibles that the Bank has a security interest in such Collateral and that payments shall be made directly to the Bank. Upon the request of the Bank at any time upon the occurrence of a Default, the Borrower will so notify such account debtors. The Borrower will use all reasonable efforts to cause each account debtor to comply with the foregoing instruction. In furtherance of the foregoing, the Borrower authorizes the Bank (i) to ask for, demand, collect, receive and give acquittances and receipts for any and all amounts due and to become due under any Collateral and, in the name of the Borrower or its own name or otherwise, (ii) to take possession of, endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Collateral and (iii) to file any claim or take any other action in any court of law or equity or otherwise which it may deem appropriate for the purpose of collecting any amounts due under any Collateral. The Bank shall have no obligation to obtain or record any information relating to the source of such funds or the obligations in respect of which payments have been made.

### Section 2.4. Segregation of Proceeds.

(a)  The Bank shall have the right at any time upon the occurrence of a Default to cause to be opened and maintained at the principal office of the Bank a non-interest bearing bank account (the "Cash Collateral Account") which will contain only Proceeds. Any cash proceeds (as such term is defined in Section 9-306(1) of the UCC) received by the Bank directly from Account Debtors obligated to make payments under Receivables or Other Intangibles pursuant to Section 2.3 or from the Borrower pursuant to clause (b) of this Section 2.4, whether consisting of checks, notes, drafts, bills of exchange, money orders, commercial paper or other Proceeds received on account of any Collateral, shall be promptly deposited in the Cash Collateral Account, and until so deposited shall be held in trust for and as the Bank's property and shall not be commingled with any funds of the Borrower not constituting Proceeds of Collateral. The name in which the Cash Collateral Account is carried shall clearly indicate that the funds deposited therein are the property of the Bororwer, subject to the security interest of the Bank hereunder. Such Proceeds, when deposited, shall continue to be security for the Obligations and shall not constitute payment thereof until applied as hereinafter provided. The Bank shall have sole dominion and control over the funds deposited in the Cash Collateral Account, and such funds may be withdrawn therefrom only by the Bank; provided, however, that until a Default shall occur, all collected funds on deposit in the Cash Collateral Account, or so much thereof as is not required to make payment of the Obligations which have become due and payable, shall be withdrawn by the Bank on the Business Day next following the day on which the Bank considers the funds deposited therein to be collected funds and disbursed to the Borrower or its order.

(b)  Upon notice by the Bank to the Borrower that the Cash Collateral Account has been opened, the Borrower shall cause all cash Proceeds collected by it to be delivered to the Bank forthwith upon receipt, in the original form in which received (with such endorsements or assignments as may be necessary to permit collection thereof by the Bank), and for such purpose the Borrower hereby irrevocably authorizes and empowers the Bank, its officers, employees and authorized agents to endorse and sign the name of the Borrower on all checks, drafts, notes, money orders or other media of payment so delivered, and such endorsements or assignments shall, for all purposes, be deemed to have been made by the Borrower prior to any endorsement or assignment thereof by the Bank. The Bank may use any convenient or customary means for the purpose of collecting such checks, drafts, money orders or other media of payment.

### Section 2.5. Verification of Receivables.

The Bank shall have the right to make test verifications of Receivables in any manner and through any medium that it considers advisable, and the Borrower agrees to furnish all such assistance and information as the Bank may require in connection

- 4 -

TRADEMARK
REEL: 1773 FRAME: 0954

therewith. The Borrower at its expense will cause its chief financial officer to furnish to the Bank at any time and from time to time promptly upon the Bank's request, the following reports: (i) a reconciliation of all Receivables, (ii) an aging of all Receivables, (iii) trial balances and (iv) a test verification of such Receivables as the Bank may request.

### Section 2.6. Release of Collateral.

(a)     The Borrower may sell or realize upon or transfer or otherwise dispose of Collateral as permitted by Section 4.13, and the security interests of the Bank in such Collateral so sold, realized upon or disposed of (but not in the Proceeds arising from such sale, realization or disposition) shall cease immediately upon such sale, realization or disposition, without any further action on the part of the Bank. The Bank, if requested in writing by the Borrower but at the expense of the Borrower, is hereby authorized and instructed to deliver to the Account Debtor or the purchaser or other transferee of any such Collateral a certificate stating that the Bank no longer has a security interest therein, and such Account Debtor or such purchaser or other transferee shall be entitled to rely conclusively on such certificate for any and all purposes.

(b)     Upon the payment in full of all of the Obligations by the Borrower and if there is no commitment by the Bank to make further advances, incur obligations or otherwise give value, the Bank will (as soon as reasonably practicable after receipt of notice from the Borrower requesting the same but at the expense of the Borrower) send the Borrower, for each jurisdiction in which a UCC financing statement is on file to perfect the security interests granted to the Bank hereunder, a termination statement to the effect that the Bank no longer claims a security interest under such financing statement.

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants that:

Section 3.1. **Validity of Security Agreement; Consents.** The execution, delivery and performance of this Security Agreement and the creation of the security interests provided for herein (i) are within the Borrower's corporate power, (ii) have been duly authorized by all necessary corporate action, including the consent of shareholders where required, on behalf of the Borrower, (iii) are not in contravention of any provision of the Borrower's articles of incorporation or by-laws, (iv) do not violate any law or regulation or any order or decree of any court or governmental instrumentality applicable to the Borrower, (v) do not conflict with or result in a breach of, or constitute a default under, any indenture, mortgage, deed of trust, lease, agreement or other instrument to which the Borrower is a party or by which it or any of its properties is bound, (vi) do not result in the creation or imposition of any Lien upon any property of the Borrower other than in favor of the Bank and (vii) do not require the consent or approval of any governmental body, agency or official or other person other than those that have been obtained. This Security Agreement has been duly executed and delivered by the Borrower and constitutes the legal, valid and binding obligation of the Borrower, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or affecting the enforceability of creditors' rights generally and by general provisions of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 3.2. **Title to Collateral.** Except for the security interests granted to the Bank pursuant to this Security Agreement, the Borrower is the sole owner of each item of the Collateral, having good and marketable title thereto, free and clear of any and all Liens, except Permitted Liens.

### Section 3.3. Validity, Perfection and Priority of Security Interests.

(a)     By complying with Section 4.1, the Borrower will have created a valid security interest in favor of the Bank in all existing Collateral and in all identifiable Proceeds of such Collateral, which security interest (except in respect of motor vehicles for which the exclusive manner of perfecting a security interest therein is by noting such security interest in the certificate of title in accordance with local law) would be prior to the claims of a trustee in bankruptcy under Section 544(a) of the United States federal Bankruptcy Code. Continuing compliance by the Borrower with the

TRADEMARK
REEL: 1773 FRAME: 0955

provisions of Section 4.2 will also (i) create valid security interests in all Collateral acquired after the date hereof and in all identifiable Proceeds of such Collateral and (ii) cause such security interests in all Collateral and in all Proceeds which are (A) identifiable cash Proceeds of Collateral covered by financing statements required to be filed hereunder, (B) identifiable Proceeds in which a security interest may be perfected by such filing under the UCC and (C) any Proceeds in the Cash Collateral Account to be duly perfected under the UCC, in each case prior to the claims of a trustee in bankruptcy under the United States federal Bankruptcy Code.

(b)        The security interests of the Bank in the Collateral rank first in priority, except that the priority of the security interests may be subject to Permitted Liens. Other than financing statements or other similar documents perfecting the security interests or deed of trust liens of the Bank, no financing statements, deeds of trust, mortgages or similar documents covering all or any part of the Collateral are on file or of record in any government office in any jurisdiction in which such filing or recording would be effective to perfect a security interest in such Collateral, nor is any of the Collateral in the possession of any Person (other than the Borrower) asserting any claim thereto or security interest therein.

Section 3.4.  **Enforceability of Receivables and Other Intangibles**.  To the best knowledge of the Borrower, each Receivable and Other Intangible is a valid and binding obligation of the related Account Debtor in respect thereof, enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general provisions of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), and complies with any applicable legal requirements.

Section 3.5.  **Place of Business; Location of Collateral**.  Schedule 1 correctly sets forth the Borrower's chief executive office and principal place of business of the Borrower and the offices of the Borrower where records concerning Receivables and Other Intangibles are kept. Schedule 2 correctly sets forth the location of all Equipment and Inventory, other than rolling stock, aircraft, goods in transit and Inventory sold in the ordinary course of business as permitted by Section 4.13 of this Security Agreement. Except as otherwise specified in Schedule 2, all Inventory and Equipment has been located at the address specified on Schedule 2 at all times during the four-month period prior to the date hereof while owned by the Borrower. All Inventory has been and will be produced in compliance with the Fair Labor Standards Act, 29 U.S.C. §§ 201-219. No Inventory is evidenced by a negotiable document of title, warehouse receipt or bill of lading. No non-negotiable document of title, warehouse receipt or bill of lading has been issued to any person other than the Borrower, and the Borrower has retained possession of all of such non-negotiable documents, warehouse receipts and bills of lading. No amount payable under or in connection with any of the Collateral is evidenced by promissory notes or other instruments. The real estate listed in Schedule 3 constitutes all existing Real Estate.

Section 3.6.  **Trade Names**.  Any and all trade names, division names, assumed names or other names under which the Borrower transacts, or within the four-month period prior to the date hereof has transacted, business are specified on Schedule 4.        DUR TRAde NAMeS

## ARTICLE IV
## COVENANTS

The Borrower covenants and agrees with the Bank that until the payment in full of all Obligations and until there is no commitment by the Bank to make further advances, incur obligations or otherwise give value, the Borrower will comply with the following.

Section 4.1.  **Perfection of Security Interests**.  The Borrower will, at it expense, cause all filings and recordings and other actions specified on Schedule 5 to have been completed on or prior to the date of the first Loan under the Credit Agreement.

TRADEMARK
REEL: 1773 FRAME: 0956

## Section 4.2. Further Actions.

(a)    At all times after the date of the first Loan under the Credit Agreement, the Borrower will, at its expense, comply with the following:

(i)    as to all Receivables, Other Intangibles, Equipment and Inventory, it will cause UCC financing statements and continuation statements to be filed and to be on file in all applicable jurisdictions as required to perfect the security interests granted to the Bank hereunder, to the extent that applicable law permits perfection of a security interest by filing under the UCC;

(ii)    as to all Proceeds, it will cause all UCC financing statements and continuation statements filed in accordance with clause (i) above to include a statement or a checked box indicating that Proceeds of all items of Collateral described therein are covered; *Due and owing to Jones*

(iii)    upon the request of the Bank, it will ensure that the provisions of Section 2.4 are complied with;

(iv)    as to any amount payable under or in connection with any of the Collateral which shall be or shall become evidenced by any promissory note or other instrument, the Borrower will immediately pledge and deliver such note or other instrument to the Bank as part of the Collateral, duly endorsed in a manner satisfactory to the Bank; *Mortgage was cancelled/Principal due back to Jones 1099 OID*

(v)    as to all Real Estate acquired after the date hereof, the Borrower will execute and record such additional mortgages, deeds of trust or other real estate security documents in such form as shall be satisfactory to the Bank so as to create a valid first priority lien thereon in favor of the Bank; and *Our stolen, trespassed upon, personal/intellectual private property, the bank and all successors in assign along with all agreements – security or otherwise are herein, hereby, and forever more terminated. Any future business, if any will be on the Jones terms and conditions.*

(vi)    as to all Patents, Patent Licenses, Trademarks or Trademark Licenses, the Borrower will effect the recordation or renewal of the recordation of the security interests of the Bank therein so as to maintain valid and perfected security interests therein under all applicable state and United States federal laws. *Jones is grantor settlor and guarantor as such the creditor due and owing Jones*

(b)    The Borrower will, from time to time and at its expense, execute, deliver, file or record such financing statements pursuant to the Uniform Commercial Code, applications for certificates of title and such other statements, assignments, instruments, documents, agreements or other papers and take any other action that may be necessary or desirable, or that the Bank may reasonably request, in order to create, preserve, perfect, confirm or validate the security interests, to enable the Bank to obtain the full benefits of this Security Agreement or to enable it to exercise and enforce any of its rights, powers and remedies hereunder, including, without limitation, its right to take possession of the Collateral, and will use its best efforts to obtain such waivers from landlords and mortgagees as the Bank may request.

(c)    To the fullest extent permitted by law, the Borrower authorizes the Bank to sign and file financing and continuation statements and amendments thereto with respect to the Collateral without its signature thereon.

Section 4.3.  Change of Name, Identity or Structure.  The Borrower will not change its name, identity or corporate structure in any manner and, except as set forth on Schedule 4, will not conduct its business under any trade, assumed or fictitious name unless it shall have given the Bank at least thirty days' prior written notice thereof and shall have taken all action (or made arrangements to take such action substantially simultaneously with such change if it is impossible to take such action in advance) necessary or reasonably requested by the Bank to amend any financing statement or continuation statement relating to the security interests granted hereby in order to preserve such security interests and to effectuate or maintain the priority thereof against all Persons.

Section 4.4.  Place of Business and Collateral.  The Borrower will not change the location of (i) its places of business, (ii) its chief executive office or (iii) the office or other locations

-7-

where it keeps or holds any Collateral or any records relating thereto from the applicable location listed on Schedule 1 or 2 hereto unless, prior to such change, it notifies the Bank of such change, makes all UCC filings required by Section 4.2 and takes all other action necessary or that the Bank may reasonably request to preserve, perfect, confirm and protect the security interests granted hereby. The Borrower will in no event change the location of any Collateral if such change would cause the security interest granted hereby in such Collateral to lapse or cease to be perfected. The Borrower will at all times maintain its chief executive office within one of the forty-eight contiguous states in which Article 9 of the UCC is in effect.

Section 4.5. **Fixtures.** The Borrower will not permit any Equipment to become a fixture unless it shall have given the Bank at least ten days' prior written notice thereof and shall have taken all such action and delivered or caused to be delivered to the Bank all instruments and documents, including, without limitation, waivers and subordination agreements by any landlords and mortgagees, and filed all financing statements necessary or reasonably requested by the Bank, to preserve and protect the security interest granted herein and to effectuate or maintain the priority thereof against all Persons.

Section 4.6. **Maintenance of Records.** The Borrower will keep and maintain at its own cost and expense complete books and records relating to the Collateral which are satisfactory to the Bank including, without limitation, a record of all payments received and all credits granted with respect to the Collateral and all of its other dealings with the Collateral. The Borrower will mark its books and records pertaining to the Collateral to evidence this Security Agreement and the security interests granted hereby. For the Bank's further security, the Borrower agrees that the Bank shall have a special property interest in all of the Borrower's books and records pertaining to the Collateral and the Borrower shall deliver and turn over any such books and records to the Bank or to its representatives at any time on demand of the Bank.

Section 4.7. **Compliance with Laws, etc.** The Borrower will comply, in all material respects, with all acts, rules, regulations, orders, decrees and directions of any governmental body, agency or official applicable to the Collateral or any part thereof or to the operation of the Borrower's business except to the extent that the failure to comply would not have a material adverse effect on the financial or other condition of the Borrower; provided, however, that the Borrower may contest any act, regulation, order, decree or direction in any reasonable manner which shall not in the sole opinion of the Bank adversely affect the Bank's rights or the first priority of its security interest in the Collateral.

Section 4.8. **Payment of Taxes, etc.** The Borrower will pay promptly when due, all taxes, assessments and governmental charges or levies imposed upon the Collateral or in respect of its income or profits therefrom, as well as all claims of any kind (including claims for labor, materials and supplies), except that no such charge need be paid if (i) the validity thereof is being contested in good faith by appropriate proceedings and (ii) such charge is adequately reserved against in accordance with GAAP.

Section 4.9. **Compliance with Terms of Accounts, Contracts and Licenses.** The Borrower will perform and comply in all material respects with all of its obligations under and, all agreements relating to the Collateral to which it is a party or by which it is bound.

Section 4.10. **Limitation on Liens on Collateral.** The Borrower will not create, permit or suffer to exist, and will defend the Collateral and the Borrower's rights with respect thereto against and take such other action as is necessary to remove, any Lien, security interest, encumbrance, or claim in or to the Collateral other than the security interests created hereunder, and except for Permitted Liens.

Section 4.11. **Limitations on Modifications of Receivables and Other Intangibles; No Waivers or Extensions.** The Borrower will not (i) amend, modify, terminate or waive any provision of any material Receivable or Other Intangible in any manner which might have a materially adverse effect on the value of such Receivable or Other Intangible as Collateral, (ii) fail to exercise promptly and diligently each and every material right which it may have under each Receivable and Other Intangible or (iii) fail to deliver to the Bank a copy of each material demand, notice or document received by it relating in any way to any Receivable or Other Intangible. The Borrower will not, without the Bank's prior written consent, grant any extension of the time of payment of any Receivable

- 8 -

No deal, no compromise given the _____ ___
harm these criminals have caused

or amounts due under any material Other Intangible, compromise, compound or settle the same for less than the full amount thereof, release, wholly or partly, any person liable for the payment thereof or allow any credit or discount whatsoever thereon other than trade discounts granted in the normal course of business, except such as in the reasonable judgment of the Borrower are advisable to enhance the collectibility thereof.

Section 4.12. **Maintenance of Insurance.** The Borrower will maintain with financially sound insurance companies licensed to do business in Virginia insurance policies (i) insuring the Inventory and Equipment against loss by fire, explosion, theft and such other casualties as are usually insured against by companies engaged in the same or similar business for an amount satisfactory to the Bank and (ii) insuring the Borrower and the Bank against liability for personal injury arising from, and property damage relating to, such Inventory and Equipment, such policies to be in such form and to cover such amounts as may be satisfactory to the Bank, with losses payable to the Borrower and the Bank as their respective interests may appear. The Borrower shall, if so requested by the Bank, deliver to the Bank as often as the Bank may reasonably request a report of the Borrower or, if requested by the Bank, of an insurance broker satisfactory to the Bank of the insurance on the Inventory and Equipment. All insurance with respect to the Inventory and the Equipment shall (i) contain a standard mortgagee clause in favor of the Bank, (ii) provide that any loss shall be payable in accordance with the terms thereof notwithstanding any act of the Borrower which might otherwise result in forfeiture of such insurance and that the insurer waives all rights of set-off, counterclaim, deduction or subrogation against the Borrower, (iii) provide that no cancellation, reduction in amount or change in coverage therefor shall be effective until at least 30 days after receipt by the Bank of written notice thereof and (iii) provide that the Bank may, but shall not be obligated to, pay premiums in respect thereof.

Section 4.13. **Limitations on Dispositions of Collateral.** The Borrower will not directly or indirectly (through the sale of stock, merger or otherwise) without the prior written consent of the Bank sell, transfer, lease or otherwise dispose of any of the Collateral, or attempt, offer or contract to do so except for (i) sales of Inventory in the ordinary course of its business for fair value in arm's-length transactions and (ii) so long as no Default has occurred and is continuing, dispositions in a commercially reasonable manner of Equipment which has become redundant, worn out or obsolete or which should be replaced so as to improve productivity, so long as the proceeds of any such disposition are (i) used to acquire replacement equipment which has comparable or better utility and equivalent or better value and which is subject to a first priority security interest in favor of the Bank therein, except as permitted by Section 4.9 and except for Permitted Liens or (ii) applied to repay the Obligations. The inclusion of Proceeds of the Collateral under the security interests granted hereby shall not be deemed a consent by the Bank to any sale or disposition of any Collateral other than as permitted by this Section 4.13.

Section 4.14. **Further Identification of Collateral.** The Borrower will furnish to the Bank from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Bank may reasonably request.

Section 4.15. **Notices.** The Borrower will advise the Bank promptly and in reasonable detail, (i) of any Lien, security interest, encumbrance or claim made or asserted against any of the Collateral, (ii) of any material change in the composition of the Collateral, and (iii) of the occurrence of any other event which would have a material effect on the aggregate value of the Collateral or on the security interests granted to the Bank in this Security Agreement.

Section 4.16. **Change of Law.** The Borrower shall promptly:

(i) notify the Bank of any change in law known to it [(and will use its best efforts to become aware of any such change in law)] which (A) adversely affects or will adversely affect the validity, perfection or priority of the security interests granted hereby, (B) requires or will require a change in the procedures to be followed in order to maintain and protect such validity, perfection and priority or (C) could result in the Bank not having a perfected security interest in any of the Collateral;

(ii) furnish the Bank with an opinion of outside legal counsel satisfactory to the Bank setting forth the procedures to be followed in order (A) to

- 9 -

avoid (or to minimize if avoidance is impossible) such adverse effect, (B) to maintain and protect such validity, perfection and priority or (C) to assure that the Bank has perfected security interests in all of the Collateral; and

        (iii)    follow the procedures set forth in such opinion of counsel.

      **Section 4.17.  Right of Inspection.**  The Bank shall at all times have full and free access during normal business hours to all the books, correspondence and records of the Borrower, and the Bank or its representatives may examine the same, take extracts therefrom, make photocopies thereof and have such discussions with officers, employees and public accountants of the Borrower as the Bank may deem necessary, and the Borrower agrees to render to the Bank, at the Borrower's cost and expense, such clerical and other assistance as may be reasonably requested with regard thereto. The Bank and its representatives shall at all times also have the right to enter into and upon any premises where any of the Inventory or Equipment is located for the purpose of inspecting the same, observing its use or protecting interests of the Bank therein.

      **Section 4.18.  Maintenance of Equipment.**  The Borrower will, at its expense, generally maintain the Equipment in good operating condition, ordinary wear and tear excepted.

      **Section 4.19.  Covenants Regarding Patent and Trademark Collateral.**

      (a)    With respect to its existing Patents and Trademarks, and at such time as . acquire any Patents or Trademarks, it will comply with the terms, covenants and ...his Section 4.19.

      (b)    The Borrower (either itself or through licensees) will, unless the Borrower reasonably determine that a Trademark is of negligible economic value to the Borrower, (A) ...tinue to use each Trademark on each and every Trademark class of goods applicable to its current products and services as reflected in its current catalogs, brochures and price lists in order to maintain each Trademark in full force and free from any claim of abandonment for non-use, (B) maintain as in the past the quality of products and services offered under each Trademark, (C) employ each Trademark with the appropriate notice of registration, (D) not adopt or use any mark which is confusingly similar or a colorable imitation of any Trademark and (E) not (and not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby any Trademark may become invalidated.

      (c)    The Borrower will not, unless the Borrower shall reasonably determine that a Patent is of negligible economic value to the Borrower, do any act, or omit to do any act, whereby any Patent may be abandoned or dedicated.

      (d)    The Borrower shall notify the Bank immediately if its knows, or has reason to know, that any application or registration relating to any Patent or Trademark may become abandoned or dedicated, or of any adverse determination or development (including, without limitation, the institution of, or any such determination or development in any proceeding in the United States Patent and Trademark Office or any court or tribunal in any country) regarding the Borrower's ownership of any Patent or Trademark, its right to register the same or keep and maintain the same.

      (e)    In no event shall the Borrower, either itself or through any agent, employee, licensee or designee, file an application for registration of any Patent or Trademark with the United States Patent and Trademark Office or any similar office or agency in any other country or any political subdivision thereof, unless it promptly informs the Bank and, upon request of the Bank, executes and delivers any and all agreements, instruments, documents and papers as the Bank may request to evidence the Bank's security interest in such Patent or Trademark and the goodwill and general intangibles of the Borrower relating thereto or represented thereby, and the Borrower hereby constitutes the Bank its attorney-in-fact to execute and file all such writings for the foregoing purposes, all such acts of such attorney being hereby ratified and confirmed. Such power being coupled with an interest is irrevocable until the Obligations are paid and satisfied in full.

      (f)    The Borrower will take all necessary steps, including, without limitation, in any proceeding before the United States Patent and Trademark Office or any similar office or agency in any other country or any political subdivision thereof, to maintain and pursue each application (and

-10-

to obtain the relevant registration) and to maintain each registration of the Patents and Trademarks, including without limitation, filing of applications for renewal, affidavits of use and affidavits of incontestability.

(g)    If any of the Patent and Trademark Collateral is infringed, misappropriated or diluted by a third party, the Borrower shall promptly notify the Bank after it learns thereof and shall, unless the Borrower shall reasonably determine that such Patent and Trademark Collateral is of negligible economic value to the Borrower, promptly sue for infringement, misappropriation or dilution, seek injunctive relief where appropriate and to recover any and all damages for such infringement, misappropriation or dilution, or to take such other action as the Borrower shall reasonably deem appropriate under the circumstances to protect such Patent and Trademark Collateral.

Section 4.20. **Reimbursement Obligation.** Should the Borrower fail to comply with the provisions of the Credit Agreement, this Security Agreement, any other Loan Document to which it is a party or any other agreement relating to the Collateral such that the value of any Collateral or the validity, perfection, rank or value of any security interest granted to the Bank hereunder or thereunder is thereby diminished or potentially diminished or put at risk (as reasonably determined by the Bank), the Bank on behalf of the Borrower may, but shall not be required to, effect such compliance on behalf of the Borrower, and the Borrower shall reimburse the Bank for the cost thereof on demand, and interest shall accrue on such reimbursement obligation from the date the relevant costs are incurred until reimbursement thereof in full at the interest rate in effect under the Note.

## ARTICLE V
## REMEDIES; RIGHTS UPON DEFAULT

Section 5.1. **UCC Rights.** If any Event of Default shall have occurred, the Bank may in addition to all other rights and remedies granted to it in this Security Agreement and in any other instrument or agreement securing, evidencing or relating to the Obligations, exercise all rights and remedies of a secured party under the UCC and all other rights available to the Bank at law or in equity.

Section 5.2. **Payments on Collateral.** Without limiting the rights of the Bank under any other provision of the Security Agreement, if an Event of Default shall occur and be continuing:

(i)    all payments received by the Borrower under or in connection with any of the Collateral shall be held by the Borrower in trust for the Bank, shall be segregated from other funds of the Borrower and shall forthwith upon receipt by the Borrower be turned over to the Bank, in the same form as received by the Borrower (duly indorsed by the Borrower to the Bank, if required to permit collection thereof by the Bank); and

(ii)    all such payments received by the Bank (whether from the Borrower or otherwise) may, in the sole discretion of the Bank, be held by the Bank as collateral security for, and/or then or at any time thereafter applied in whole or in part by the Bank to the payment of the expenses and Obligations as set forth in Section 5.10.

Section 5.3. **Possession of Collateral.** In furtherance of the foregoing, the Borrower expressly agrees that, if an Event of Default shall occur and be continuing, the Bank may (i) by judicial powers, or without judicial process if it can be done without breach of the peace, enter any premises where any of such Collateral is or may be located, and without charge or liability to the Bank seize and remove such Collateral from such premises and (ii) have access to and use of the Borrower's books and records relating to such Collateral.

TRADEMARK
REEL: 1773 FRAME: 0961

## Section 5.4. Sale of Collateral.

(a)     The Borrower expressly agrees that if an Event of Default shall occur and be continuing, the Bank, without demand of performance or other demand or notice of any kind (except the notice specified below of the time and place of any public or private sale) to the Borrower or any other Person (all of which demands and/or notices are hereby waived by the Borrower), may forthwith collect, receive, appropriate and realize upon the Collateral and/or forthwith sell, lease, assign, give an option or options to purchase or otherwise dispose of and deliver the Collateral (or contract to do so) or any part thereof in one or more parcels at public or private sale, at any exchange, broker's board or at any office of the Bank or elsewhere in such manner as is commercially reasonable and as the Bank may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  The Bank shall have the right upon any such public sale, and, to the extent permitted by law, upon any such private sale, to purchase the whole or any part of the Collateral so sold.  The Borrower further agrees, at the Bank's request, to assemble the Collateral, and to make it available to the Bank at places which the Bank may reasonably select.  To the extent permitted by applicable law, the Borrower waives all claims, damages and demands against the Bank arising out of the foreclosure, repossession, retention or sale of the Collateral.

(b)     Unless the Collateral threatens to decline speedily in value or is of a type customarily sold in a recognized market, the Bank shall give the Borrower ten days written notice of its intention to make any such public or private sale or sale at a broker's board or on a securities exchange.  Such notice shall (i) in the case of a public sale, state the time and place fixed for such sale, (ii) in the case of a sale at a broker's board or on a securities exchange, state the board or exchange at which such sale is to be made and the day on which the Collateral, or any portion thereof being sold, will first be offered for sale and (iii) in the case of a private sale, state the day after which such sale may be consummated.  The Bank shall not be required or obligated to make any such sale pursuant to any such notice.  The Bank may adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the same may be so adjourned.  In the case of any sale of all or any part of the Collateral for credit or for future delivery, the Collateral so sold may be retained by the Bank until the selling price is paid by the purchaser thereof, but the Bank shall not incur any liability in case of failure of such purchaser to pay for the Collateral so sold and, in the case of such failure, such Collateral may again be sold upon like notice.

## Section 5.5. Rights of Purchasers.

Upon any sale of the Collateral (whether public or private), the Bank shall have the right to deliver, assign and transfer to the purchaser thereof the Collateral so sold.  Each purchaser (including the Bank) at any such sale shall hold the Collateral so sold free from any claim or right of whatever kind, including any equity or right of redemption of the Borrower, and the Borrower, to the extent permitted by law, hereby specifically waives all rights of redemption, including, without limitation, the right to redeem the Collateral under Section 9-506 of the UCC, and any right to a judicial or other stay or approval which it has or may have under any law now existing or hereafter adopted.

## Section 5.6. Additional Rights of the Bank.

(a)     The Bank shall have the right and power to institute and maintain such suits and proceedings as it may deem appropriate to protect and enforce the rights vested in it by this Security Agreement and may proceed by suit or suits at law or in equity to enforce such rights and to foreclose upon and sell the Collateral or any part thereof pursuant to the judgment or decree of a court of competent jurisdiction.

(b)     The Bank shall, to the extent permitted by law and without regard to the solvency or insolvency at the time of any Person then liable for the payment of any of the Obligations or the then value of the Collateral, and without requiring any bond from any party to such proceedings, be entitled to the appointment of a special receiver or receivers (who may be the Bank) for the Collateral or any part thereof and for the rents, issues, tolls, profits, royalties, revenues and other income therefrom, which receiver shall have such powers as the court making such appointment shall confer, and to the entry of an order directing that the rents, issues, tolls, profits, royalties, revenues and other income of the property constituting the whole or any part of the Collateral be segregated, sequestered and impounded for the benefit of the Bank, and the Borrower irrevocably consents to the appointment of such receiver or receivers and to the entry of such order.

TRADEMARK
REEL: 1773 FRAME: 0962

### Section 5.7. Remedies Not Exclusive.

(a)    No remedy conferred upon or reserved to the Bank in this Security Agreement is intended to be exclusive of any other remedy or remedies, but every such remedy shall be cumulative and shall be in addition to every other remedy conferred herein or now or hereafter existing at law, in equity or by statute.

(b)    If the Bank shall have proceeded to enforce any right, remedy or power under this Security Agreement and the proceeding for the enforcement thereof shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Bank, the Borrower and the Bank shall, subject to any determination in such proceeding, severally and respectively be restored to their former positions and rights under this Security Agreement, and thereafter all rights, remedies and powers of the Bank shall continue as though no such proceedings had been taken.

(c)    All rights of action under this Security Agreement may be enforced by the Bank without the possession of any instrument evidencing any Obligation or the production thereof at any trial or other proceeding relative thereto, and any suit or proceeding instituted by the Bank shall be brought in its name and any judgment shall be held as part of the Collateral.

### Section 5.8. Waiver and Estoppel.

(a)    The Borrower, to the extent it may lawfully do so, agrees that it will not at any time in any manner whatsoever claim or take the benefit or advantage of any appraisement, valuation, stay, extension, moratorium, turnover or redemption law, or any law now or hereafter in force permitting it to direct the order in which the Collateral shall be sold which may delay, prevent or otherwise affect the performance or enforcement of this Security Agreement and the Borrower hereby waives the benefits or advantage of all such laws, and covenants that it will not hinder, delay or impede the execution of any power granted to the Bank in this Security Agreement but will permit the execution of every such power as though no such law were in force; provided that nothing contained in this Section 5.8 shall be construed as a waiver of any rights of the Borrower under any applicable federal bankruptcy law.

(b)    The Borrower, to the extent it may lawfully do so, on behalf of itself and all who may claim through or under it, including without limitation any and all subsequent creditors, vendees, assignees and lienors, waives and releases all rights to demand or to have any marshalling of the Collateral upon any sale, whether made under any power of sale granted herein or pursuant to judicial proceedings or upon any foreclosure or any enforcement of this Security Agreement and consents and agrees that all the Collateral may at any such sale be offered and sold as an entirety.

(c)    The Borrower, to the extent it may lawfully do so, waives presentment, demand, protest and any notice of any kind (except notices explicitly required hereunder) in connection with this Security Agreement and any action taken by the Bank with respect to the Collateral.

Section 5.9. Power of Attorney. The Borrower hereby irrevocably constitutes and appoints the Bank, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Borrower and in the name of the Borrower or in its own name, from time to time in the Bank's reasonable discretion for the purpose of carrying out the terms of this Security Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Security Agreement and, without limiting the generality of the foregoing, hereby gives the Bank the power and right, on behalf of the Borrower, without notice to or assent by the Borrower to do the following:

(i)    to pay or discharge taxes, liens, security interests or other encumbrances levied or placed on or threatened against the Collateral;

(ii)    to effect any repairs or any insurance called for by the terms of this Security Agreement and to pay all or any part of the premiums therefor and the costs thereof; and

-13-

TRADEMARK
REEL: 1773 FRAME: 0963

(iii)     upon the occurrence and continuance of any Event of Default and otherwise to the extent provided in this Security Agreement, (A) to direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due and to come due thereunder directly to the Bank or as the Bank shall direct; (B) to receive payment of and receipt for any and all moneys, claims and other amounts due and to become due at any time in respect of or arising out of any Collateral; (C) to sign and indorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with accounts and other documents relating to the Collateral; (D) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any thereof and to enforce any other right in respect of any Collateral; (E) to defend any suit, action or proceeding brought against the Borrower with respect to any Collateral; (F) to settle, compromise and adjust any suit, action or proceeding described above and, in connection therewith, to give such discharges or releases as the Bank may deem appropriate; (G) to assign any Patent or Trademark (along with the goodwill of the business to which such Trademark pertains), for such term or terms, on such conditions, and in such manner, as the Bank shall in its sole discretion determine; and (H) generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Bank were the absolute owner thereof for all purposes, and to do, at the Bank's option and the Borrower's expense, at any time, or from time to time, all acts and things which the Bank deems necessary to protect, preserve or realize upon the Collateral and the Bank's security interest therein, in order to effect the intent of this Security Agreement, all as fully and effectively as the Borrower might do.

The Borrower hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable.

Section 5.10.  **Application of Proceeds.**  The Bank shall retain the net proceeds of any collection, recovery, receipt, appropriation, realization or sale of the Collateral and, after deducting all reasonable costs and expenses of every kind incurred therein or incidental to the care and safekeeping of any or all of the Collateral or in any way relating to the rights of the Bank hereunder, including reasonable attorneys' fees and legal expenses, apply such net proceeds to the payment in whole or in part of the Obligations in such order as the Bank may elect, the Borrower remaining liable for any amount remaining unpaid (and any attorneys fees paid by the Bank in collecting such deficiency) after such application.  Only after applying such net proceeds and after the payment by the Bank of any other amount required by any provision of law, including Section 9-504(1)(c) of the UCC, need the Bank account for the surplus, if any, to the Borrower or to whomsoever may be lawfully entitled to the same.

### ARTICLE VI
### MISCELLANEOUS

Section 6.1.  **Notices.**  Unless otherwise specified herein, all notices, requests or other communications to any party hereunder shall be in writing and shall be given to such party at its address set forth on the signature pages hereof or any other address or which such party shall have specified for the purpose of communications hereunder by notice to the other parties hereunder.  Each such notice, request or other communication shall be effective (i) if given by mail, three days after such communication is deposited, certified or registered, in the mails with first class postage prepaid, addressed as aforesaid or (ii) if given by other means, when delivered at the address specified in this Section 6.1.

Section 6.2.  **No Waivers.**  No failure on the part of the Bank to exercise, no course of dealing with respect to, and no delay in exercising any right, power or privilege under this Security Agreement or any document or agreement contemplated hereby shall operate as a waiver thereof or

-14-

shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

Section 6.3. **Compensation and Expenses of the Bank.** The Borrower shall pay to the Bank from time to time upon demand, all of the fees, costs and expenses incurred by the Bank (including, without limitation, the reasonable fees and disbursements of counsel and any amounts payable by the Bank to any of its agents, whether on account of fees, indemnities or otherwise) (i) arising in connection with the preparation, administration, modification, amendment, waiver or termination of this Security Agreement or any document or agreement contemplated hereby or any consent or waiver hereunder or thereunder or (ii) incurred in connection with the administration of this Security Agreement, or any document or agreement contemplated hereby, or in connection with the administration, sale or other disposition of Collateral hereunder or under any document or agreement contemplated hereby or the preservation, protection or defense of the rights of the Bank in and to the Collateral.

Section 6.4. **Indemnification.** The Borrower shall at all times hereafter indemnify, hold harmless and, on demand, reimburse the Bank, its subsidiaries, affiliates, successors, assigns, officers, directors, employees and agents, and their respective heirs, executors, administrators, successors and assigns (all of the foregoing parties, including, but not limited to, the Bank, being hereinafter collectively referred to as the "Indemnities" and individually as an "Indemnitee") from, against and for any and all liabilities, obligations, claims, damages, actions, penalties, causes of action, losses, judgments, suits, costs, expenses and disbursements, including, without limitation, attorney's fees (any and all of the foregoing being hereinafter collectively referred to as the "Liabilities" and individually as a "Liability") which the Indemnitees, or any of them, might be or become subjected, by reason of, or arising out of the preparation, execution, delivery, modification, administration or enforcement of, or performance of the Bank's rights under, this Security Agreement or any other document, instrument or agreement contemplated hereby or executed in connection herewith; provided that the Borrower shall not be liable to any Indemnitee for any Liability caused solely by the gross negligence or willful misconduct of such Indemnitee. In no event shall any Indemnitee, as a condition to enforcing its rights under this Section 6.4 or otherwise, be obligated to make a claim against any other Person (including, without limitation, the Bank) to enforce its rights under this Section 6.4. ←

Section 6.5. **Amendments, Supplements and Waivers.** The parties hereto may, from time to time, enter into written agreements supplemental hereto for the purpose of adding any provisions to this Security Agreement, waiving any provisions hereof or changing in any manner the rights of the parties.

Section 6.6. **Successors and Assigns.** This Security Agreement shall be binding upon and inure to the benefit of each of the parties hereto and shall inure to the benefit of the Bank's successors and assigns, including, without limitation, any or all of the Guarantors through subrogation. Nothing herein is intended or shall be construed to give any other Person any right, remedy or claim under, to or in respect of this Security Agreement or any Collateral.

Section 6.7. **Limitation of Law; Severability.** (a) All rights, remedies and powers provided in this Security Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law, and all the provisions of this Security Agreement are intended to be subject to all applicable mandatory provisions of law which may be controlling and to be limited to the extent necessary so that they will not render this Security Agreement invalid, unenforceable in whole or in part, or not entitled to be recorded, registered or filed under the provisions of any applicable law. ——————————————→

*Fraud is over this agreements terms are cancelled, extinguished, revoked and annulled*

(b)     If any provision hereof is invalid and unenforceable in any jurisdiction, then, to the fullest extent permitted by law, (i) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in order to carry out the intentions of the parties hereto as nearly as may be possible; and (ii) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provisions in any other jurisdiction.

Section 6.8. **Governing Law.** This Security Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia.

*Don't think SS, the commonwealth is hereby and herein revoked, rebutted, cancelled, extinguished, all lines of business and trespass are herein and forevermore cancelled with any monies, stocks, bonds, insurances, proceeds, properties, assets due back to Jones immediately*

-5-

*The Jones(es) are indemnified, no indemnity for criminal and unlawful acts with demand for complete and total reversion x 3 times damages from Merrill Lynch, Wells Fargo, JP Morgan, UBS, Credit Suisse, BONY, DTCC, Robinson-Tait, Hobson-Allison, HSBC, AIG, Blackrock, Ocwen, William Dallas, US Bank, C'BASS, Deutsche Bank, Corelogic, First American, Commonwealth Equity, ISO, New Leaf Public Benefits Association, Merscorp Holdings and Bank of America*

**Section 6.9. Counterparts; Effectiveness.** This Security Agreement may be signed in any number of counterparts with the same effect as if the signatures thereto and hereto were upon the same instrument. This Security Agreement shall become effective when the Bank shall receive counterparts executed by itself and the Borrower.

**Section 6.10. Termination; Survival.** This Security Agreement shall terminate when the security interests granted hereunder have terminated and the Collateral has been released as provided in Section 2.6, provided that the obligations of the Borrower under any of Section 4.20, 6.3, and 6.4 shall survive any such termination.

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be duly executed by their respective authorized officers as of the day and year first written above.

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.                                    [SEAL]

8201 Greensboro Drive, Suite 350
McLean, Virginia 22102

By _____

Name: R.K. ARNOLD

Title: President

The Jones(es) demand R.K. Arnold is brought in on criminal charges and prosecuted for numerous unlawful acts along with Merscorp Holdings and Bank of America

-16-



**Certified Forensic Loan Auditors**

## PARTIES/DEFENDANTS:

**Offering Circular Supplement**

**(To Multifamily Base Offering Circular dated October 1, 2011)**



## $829,795,263

## Government National Mortgage Association

# GINNIE MAE®

**Guaranteed REMIC Pass-Through Securities and MX Securities**
**Ginnie Mae REMIC Trust 2012-129**



## Barclays Capital Inc.



**Loop Capital Markets, LLC**

**The date of this Offering Circular Supplement is November 20, 2012.**

The document is not available on the SEC web site. Following this section would normally be the "Assignment of Mortgage" type section of the Prospectus Supplement; but this security has no such verbiage. Furthermore, there is no pooling and servicing agreement (PSA) that is publically available. Thus, extracts of the "Conveyance of Loans" type section (normally Section 2.01) from any such PSA is not available.

http://www.ginniemae.gov/doing_business_with_ginniemae/investor_resources/Prospectuses/ProspectusesLib/2012Nov20-129.pdf

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*

Exhibit E

THE WELLS FARGO'S OWN WORDS, THERE IS NO Lender IN securitization



# Conduit loan servicing: Who's who and what's what?

The thing most borrowers fail to realize about conduit loans is that once a loan has been securitized, they are not working with a "lender" anymore. The loans are pooled into a securitization called a Real Estate Mortgage Investment Conduit (REMIC). The REMIC is a trust and it has no lenders, only fiduciaries of the "certificate holders." Once the loans have been pooled and securitized, the players are as follows:

**Master Servicer** - The Master Servicer collects payments, escrows, reserves and financial information on behalf of the REMIC Trustee. The Master Servicer visits each asset (at its expense) every year for large loans, every other year for small loans. As of April 2012, Wells Fargo is the largest Master Servicer in the country with over $500 billion in master and prime servicing. The second largest is PNC Real Estate/Midland Loan Services. Master Servicers are rated and evaluated by the rating agencies. If a loan becomes delinquent, the Master Servicer is usually obligated to make the first three or four payments to the certificate holders as well as pay trust expenses on delinquent assets. This way, if a borrower is late or misses a payment, but makes it up quickly, the certificate holders have had no disruption in payments. The Master Servicer is reimbursed when the borrower makes up the payment or when the property goes into foreclosure and is later sold. Because the certificate holders are relying on the Master Servicer to make these payments, the creditworthiness of the Master Servicer is a key to the selection process.

**Special Servicer** – The Special Servicer is the party designated to "work-out" loans or foreclose on loans if they go into default. The Special Servicer may agree to modification, waiver or amendment of any term, extend maturity, defer or forgive interest or prepayment charges and permit the release or substitution of collateral, borrower or guarantor as long as it is "in the best interest of the certificate holders." If a loan is in default for more than two payments (60 days) or defaults at maturity, it is assigned to the Special Servicer who takes over direct discussions with the borrower. The Special Servicer can also get involved if it gets notice of "imminent" default. The Special Servicer makes all final decisions about dispositions of defaulted property and Real Estate Owned (REO). Often they are also the holders of the "first loss pieces" of the pool. Because they are taking the most risk, as part of their agreement to take that risk, they usually insist on being the Special Servicer as a requirement of their investment. There are only a handful of special servicers in the country.

Together we'll go far



©2012 Wells Fargo Bank, N.A. All rights reserved

Exhibit E

If the Special Servicer is willing to extend the loan, they have to get permission from the Controlling Class Representative (CCR), who is a fiduciary for all the certificate holders. The CCR was designated when the REMIC was created and the PSA was signed. The largest class of certificate holders is always the AAA rated tranche who aren't likely to lose any money if the deal gets foreclosed and sold at a discount because they have first lien on the proceeds. Without permission from the CCR, the Special Servicer could be liable if they made any decisions that did not protect all classes. This is one reason why Special Servicers may be reluctant to extend a loan.

Most AAA holders are anxious to get their investment back as soon as possible. Most PSAs give the Special Servicers the right to extend loans up to a maximum of three years, but a typical extension is usually 60 days to six months.

3. **A loan matures with no replacement lender, and the property is worth <u>more</u> than the current debt.** Assume that a loan has matured and the property is worth more than the debt. Remember, there are no "pockets of money" to use for refinance. Special Servicers, although legally allowed by the PSA to forgive any portion of the debt, rarely do so because often that would negatively affect one or more of the bondholders at the expense of the others. Instead, the Special Servicer, on behalf of the conduit, will almost always foreclose and sell the asset.

All of the aforementioned parties are "fiduciaries" for the pool; that is, they are required to act in the best interest of all the investment classes of certificate holders.

In this economic environment it is critical to understand your specific loan terms, and any default risks they may pose, so you can plan accordingly. The "friendly banker" you knew five years ago may not be the party you will be dealing with tomorrow.

*Tony Petosa, Nick Bertino, and Creighton Weber specialize in financing manufactured home communities ("MHC"), offering Fannie Mae, conduit, portfolio, and correspondent lending programs.*

**Petosa and Bertino** *can be reached at 760/438-2153; 760/438-8710 fax; and via email, tpetosa@wellsfargo.com, nick.bertino@wellsfargo.com; and*
**Weber** *can be reached at 248/723-3119; 248/723-3135 fax; and via email, cweber@wellsfargo.com*



# FHA Loan in the Securitization Process

Borrower finds home they'd like to buy

Borrower goes to FHA-approved lender to obtain mortgage

Lender had already pre-sold the mortgage & locked in a rate; *See slide 7, "Mon. 9AM"*

60-90 days

Borrower's application is processed & mortgage closes

Once mortgage is closed & delivered, servicing of the loan begins

Lender pools loan & delivers MBS to investors; *See slide 8, "Settlement Date"*



Borrower makes monthly payment to lender/servicer who forwards it to investors

**Offering Circular Supplement**
**(To Base Offering Circular dated October 1, 2011)**



# $829,795,263
# Government National Mortgage Association
# GINNIE MAE®
### Guaranteed REMIC Pass-Through Securities
### and MX Securities
### Ginnie Mae REMIC Trust 2012-129

### The Securities

The Trust will issue the Classes of Securities listed on the front cover of this offering circular supplement.

### The Ginnie Mae Guaranty

Ginnie Mae will guarantee the timely payment of principal and interest on the securities. The Ginnie Mae Guaranty is backed by the full faith and credit of the United States of America.

### The Trust and its Assets

The Trust will own Ginnie Mae Certificates.

**The securities may not be suitable investments for you. You should consider carefully the risks of investing in them.**

**See "Risk Factors" beginning on page S-8 which highlights some of these risks.**

The Sponsor and the Co-Sponsor will offer the securities from time to time in negotiated transactions at varying prices. We expect the closing date to be November 30, 2012.

You should read the Base Offering Circular as well as this Supplement.

The securities are exempt from registration under the Securities Act of 1933 and are "exempted securities" under the Securities Exchange Act of 1934.

| Class of REMIC Securities | Original Principal Balance(2) | Interest Rate | Principal Type(3) | Interest Type(3) | CUSIP Number | Final Distribution Date(4) |
|---|---|---|---|---|---|---|
| **Security Group 1** | | | | | | |
| IM | $66,666,666 | 3.00% | NTL(PT) | FIX/IO | 38378GHB7 | May 2013 |
| TM | 200,000,000 | (5) | PT | ARB | 38378GHC5 | November 2042 |
| **Security Group 2** | | | | | | |
| IO(1) | 62,777,777 | 4.50 | NTL(PT) | FIX/IO | 38378GHD3 | November 2042 |
| PB | 87,087,000 | 1.50 | PAC I | FIX | 38378GHE1 | April 2042 |
| PE | 4,633,000 | 2.00 | PAC I | FIX | 38378GHF8 | November 2042 |
| PI(1) | 9,676,333 | 4.50 | NTL(PAC I) | FIX/IO | 38378GHG6 | April 2042 |
| WA | 11,273,000 | 2.00 | SUP | FIX | 38378GHH4 | September 2042 |
| WB | 626,000 | 2.00 | SUP | FIX | 38378GHJ0 | October 2042 |
| WC | 626,000 | 2.00 | SUP | FIX | 38378GHK7 | November 2042 |
| YA | 6,278,000 | 2.00 | PAC II | FIX | 38378GHL5 | July 2042 |
| YB | 1,416,000 | 2.00 | PAC II | FIX | 38378GHM3 | October 2042 |
| YC | 1,061,000 | 2.00 | PAC II | FIX | 38378GHN1 | November 2042 |
| **Security Group 3** | | | | | | |
| A | 83,563,000 | 1.75 | SEQ/AD | FIX | 38378GHP6 | August 2037 |
| AI | 34,817,916 | 3.00 | NTL(SEQ/AD) | FIX/IO | 38378GHQ4 | August 2037 |
| Z | 13,232,263 | 3.00 | SEQ | FIX/Z | 38378GHR2 | November 2042 |
| **Security Group 4** | | | | | | |
| MI | 66,666,666 | 3.00 | NTL(PT) | FIX/IO | 38378GHS0 | May 2013 |
| MT | 200,000,000 | (5) | PT | ARB | 38378GHT8 | November 2042 |
| **Security Group 5** | | | | | | |
| QI | 6,666,666 | 3.00 | NTL(PT) | FIX/IO | 38378GHU5 | May 2013 |
| QT | 20,000,000 | (5) | PT | ARB | 38378GHV3 | November 2042 |
| **Security Group 6** | | | | | | |
| IQ | 66,666,666 | 3.00 | NTL(PT) | FIX/IO | 38378GHW1 | May 2013 |
| TQ | 200,000,000 | (5) | PT | ARB | 38378GHX9 | November 2042 |
| **Residuals** | | | | | | |
| RR | 0 | 0.00 | NPR | NPR | 38378GHY7 | November 2042 |
| R1 | 0 | 0.00 | NPR | NPR | 38378GHZ4 | November 2042 |
| R4 | 0 | 0.00 | NPR | NPR | 38378GJA7 | November 2042 |
| R5 | 0 | 0.00 | NPR | NPR | 38378GJB5 | November 2042 |
| R6 | 0 | 0.00 | NPR | NPR | 38378GJC3 | November 2042 |

(1) These Securities may be exchanged for MX Securities described in Schedule I to this Supplement.

(2) Subject to increase as described under "Increase in Size" in this Supplement. The amount shown for each Notional Class (indicated by "NTL" under Principal Type) is its original Class Notional Balance and does not represent principal that will be paid.

(3) As defined under "Class Types" in Appendix I to the Base Offering Circular. The type of Class with which the Class Notional Balance of each Notional Class will be reduced is indicated in parentheses. The Class Notional Balance of Class IO will be reduced with the outstanding principal balance of the related Trust Asset Group.

(4) See "Yield, Maturity and Prepayment Considerations — Final Distribution Date" in this Supplement.

(5) See "Terms Sheet — Interest Rates" in this Supplement.

## Barclays

## Loop Capital Markets LLC

**The date of this Offering Circular Supplement is November 20, 2012.**





**Certified Forensic Loan Auditors**

Shows the splitting of the investment trust into 27 separate investment classes

| CF Class | Orig(000) | Cpn | OWAL | Factor Cusip | Description | Group Des |
|---|---|---|---|---|---|---|
| 1) Pd IM | 66,667 | 3.000 | 0.46 | 0.0000 38378GHB7 | IO, NTL, PT | 1: 30YR/3.0/GNMA/G1 |
| 2) Pd TM | 200,000 | 3.000 | 7.22 | 0.0000 38378GHC5 | ARB, PT | 1: 30YR/3.0/GNMA/G1 |
| 3) * IO | 62,778 | 4.500 | 6.48 | 0.5599 38378GHD3 | IO, NTL, PT | 2: 30YR/4.5/GNMA/G2 |
| 4) * PB | 87,087 | 1.500 | 5.36 | 0.6161 38378GHE1 | PAC-1(11) | 2: 30YR/4.5/GNMA/G2 |
| 5) * PE | 4,633 | 2.000 | 19.75 | 1.0000 38378GHF8 | PAC-1(11) | 2: 30YR/4.5/GNMA/G2 |
| 6) * PI | 9,676 | 4.500 | 5.36 | 0.6161 38378GHG6 | IO, NTL, PAC-1 | 2: 30YR/4.5/GNMA/G2 |
| 7) Pd WA | 11,273 | 2.000 | 8.02 | 0.0000 38378GHH4 | SUP | 2: 30YR/4.5/GNMA/G2 |
| 8) Pd WB | 626 | 2.000 | 23.13 | 0.0000 38378GHJ0 | SUP | 2: 30YR/4.5/GNMA/G2 |
| 9) * WC | 626 | 2.000 | 25.73 | 0.6251 38378GHK7 | SUP | 2: 30YR/4.5/GNMA/G2 |
| 10) * YA | 6,278 | 2.000 | 2.90 | 0.3365 38378GHL5 | PAC-2(22) | 2: 30YR/4.5/GNMA/G2 |
| 11) * YB | 1,416 | 2.000 | 11.90 | 1.0000 38378GHM3 | PAC-2(22) | 2: 30YR/4.5/GNMA/G2 |
| 12) * YC | 1,061 | 2.000 | 16.39 | 1.0000 38378GHN1 | PAC-2(22) | 2: 30YR/4.5/GNMA/G2 |
| 13) * A | 83,563 | 1.750 | 7.33 | 0.6835 38378GHP6 | AD, SEQ | 3: 30YR/3.0/GNMA2/G3 |
| 14) * AI | 34,818 | 3.000 | 7.33 | 0.6835 38378GHQ4 | IO, NTL, AD, SEQ | 3: 30YR/3.0/GNMA2/G3 |
| 15) * Z | 13,232 | 3.000 | 21.89 | 1.1050 38378GHR2 | Z, SEQ | 3: 30YR/3.0/GNMA2/G3 |
| 16) Pd MI | 66,667 | 3.000 | 0.46 | 0.0000 38378GHS0 | IO, NTL, PT | 4: 30YR/3.0/GNMA/G4 |
| 17) Pd MT | 200,000 | 2.000 | 7.22 | 0.0000 38378GHT8 | ARB, PT | 4: 30YR/3.0/GNMA/G4 |
| 18) Pd QI | 6,667 | 3.000 | 0.46 | 0.0000 38378GHU5 | IO, NTL, PT | 5: 30YR/3.0/GNMA/G5 |
| 19) Pd QT | 20,000 | 3.000 | 7.22 | 0.0000 38378GHV3 | ARB, PT | 5: 30YR/3.0/GNMA/G5 |

GNR 2012-129 WC Mtge · VAC · Related Functions Menu

**VAC**

<Menu> for series list

99) Options — Page 1/2 View All Classes

GNR 2012-129 GOVERNMENT NATIONAL MORTGAGE ASSOCIATION — 27 Classes

Template Agency

GNR 2012-129 WC Mtge · VAC · Related Functions Menu

**VAC**

<Menu> for series list

99) Options — Page 2/2 View All Classes

GNR 2012-129 GOVERNMENT NATIONAL MORTGAGE ASSOCIATION — 27 Classes

Template Agency

| CF Class | Orig(000) | Cpn | OWAL | Factor Cusip | Description | Group Des |
|---|---|---|---|---|---|---|
| 1) Pd IQ | 66,667 | 3.000 | 0.47 | 0.0000 38378GHW1 | IO, NTL, PT | 6: 30YR/3.0/GNMA2... |
| 2) Pd TQ | 200,000 | 3.000 | 7.23 | 0.0000 38378GHX9 | ARB, PT | 6: 30YR/3.0/GNMA2... |
| 3) RR | 0 | 0.000 | 0.00 | 0.0000 38378GHY7 | R, NPR | ALL collateral |
| 4) R1 | 0 | 0.000 | 0.00 | 0.0000 38378GHZ4 | R, NPR | ALL collateral |
| 5) R4 | 0 | 0.000 | 0.00 | 0.0000 38378GJA7 | R, NPR | ALL collateral |
| 6) R5 | 0 | 0.000 | 0.00 | 0.0000 38378GJB5 | R, NPR | ALL collateral |
| 7) R6 | 0 | 0.000 | 0.00 | 0.0000 38378GJC3 | R, NPR | ALL collateral |
| 8) * OI | 72,454 | 4.500 | 6.33 | 0.5674 38378GJD1 | IO, EXCH, NTL, PAC-1, PT | 2: 30YR/4.5/GNMA/... |

*Exhibit G*

CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016

**Offering Circular Supplement**
**(To Base Offering Circular dated October 1, 2011)**



# $829,795,263

## Government National Mortgage Association

## GINNIE MAE®

### Guaranteed REMIC Pass-Through Securities and MX Securities
### Ginnie Mae REMIC Trust 2012-129

**The Securities**

The Trust will issue the Classes of Securities listed on the front cover of this offering circular supplement.

**The Ginnie Mae Guaranty**

Ginnie Mae will guarantee the timely payment of principal and interest on the securities. The Ginnie Mae Guaranty is backed by the full faith and credit of the United States of America.

**The Trust and its Assets**

The Trust will own Ginnie Mae Certificates.

---

**The securities may not be suitable investments for you. You should consider carefully the risks of investing in them.**

**See "Risk Factors" beginning on page S-8 which highlights some of these risks.**

---

The Sponsor and the Co-Sponsor will offer the securities from time to time in negotiated transactions at varying prices. We expect the closing date to be November 30, 2012.

You should read the Base Offering Circular as well as this Supplement.

The securities are exempt from registration under the Securities Act of 1933 and are "exempted securities" under the Securities Exchange Act of 1934.

| Class of REMIC Securities | Original Principal Balance(2) | Interest Rate | Principal Type(3) | Interest Type(3) | CUSIP Number | Final Distribution Date(4) |
|---|---|---|---|---|---|---|
| **Security Group 1** | | | | | | |
| IM | $66,666,666 | 3.00% | NTL(PT) | FIX/IO | 38378GHB7 | May 2013 |
| TM | 200,000,000 | (5) | PT | ARB | 38378GHC5 | November 2042 |
| **Security Group 2** | | | | | | |
| IO(1) | 62,777,777 | 4.50 | NTL(PT) | FIX/IO | 38378GHD3 | November 2042 |
| PB | 87,087,000 | 1.50 | PAC I | FIX | 38378GHE1 | April 2042 |
| PE | 4,633,000 | 2.00 | PAC I | FIX | 38378GHF8 | November 2042 |
| PI(1) | 9,676,333 | 4.50 | NTL(PAC I) | FIX/IO | 38378GHG6 | April 2042 |
| WA | 11,273,000 | 2.00 | SUP | FIX | 38378GHH4 | September 2042 |
| WB | 626,000 | 2.00 | SUP | FIX | 38378GHJ0 | October 2042 |
| WC | 626,000 | 2.00 | SUP | FIX | 38378GHK7 | November 2042 |
| YA | 6,278,000 | 2.00 | PAC II | FIX | 38378GHM3 | July 2042 |
| YB | 1,416,000 | 2.00 | PAC II | FIX | 38378GHL5 | October 2042 |
| YC | 1,061,000 | 2.00 | PAC II | FIX | 38378GHN1 | November 2042 |
| **Security Group 3** | | | | | | |
| A | 83,563,000 | 1.75 | SEQ/AD | FIX | 38378GHP6 | August 2037 |
| AI | 34,817,916 | 3.00 | NTL(SEQ/AD) | FIX/IO | 38378GHQ4 | August 2037 |
| Z | 13,232,263 | 3.00 | SEQ | FIX/Z | 38378GHR2 | November 2042 |
| **Security Group 4** | | | | | | |
| MI | 66,666,666 | 3.00 | NTL(PT) | FIX/IO | 38378GHS0 | May 2013 |
| MT | 200,000,000 | (5) | PT | ARB | 38378GHT8 | November 2042 |
| **Security Group 5** | | | | | | |
| QI | 6,666,666 | 3.00 | NTL(PT) | FIX/IO | 38378GHU5 | May 2013 |
| QT | 20,000,000 | (5) | PT | ARB | 38378GHV3 | November 2042 |
| **Security Group 6** | | | | | | |
| IQ | 66,666,666 | 3.00 | NTL(PT) | FIX/IO | 38378GHW1 | May 2013 |
| TQ | 200,000,000 | (5) | PT | ARB | 38378GHX9 | November 2042 |
| **Residuals** | | | | | | |
| RR | 0 | 0.00 | NPR | NPR | 38378GHY7 | November 2042 |
| R1 | 0 | 0.00 | NPR | NPR | 38378GHZ4 | November 2042 |
| R4 | 0 | 0.00 | NPR | NPR | 38378GJA7 | November 2042 |
| R5 | 0 | 0.00 | NPR | NPR | 38378GJB5 | November 2042 |
| R6 | 0 | 0.00 | NPR | NPR | 38378GJC3 | November 2042 |

(1) These Securities may be exchanged for MX Securities described in Schedule I to this Supplement.

(2) Subject to increase as described under "Increase in Size" in this Supplement. The amount shown for each Notional Class (indicated by "NTL" under Principal Type) is its original Class Notional Balance and does not represent principal that will be paid.

(3) As defined under "Class Types" in Appendix I to the Base Offering Circular. The type of Class with which the Class Notional Balance of each Notional Class will be reduced is indicated in parentheses. The Class Notional Balance of Class IO will be reduced with the outstanding principal balance of the related Trust Asset Group.

(4) See "Yield, Maturity and Prepayment Considerations — Final Distribution Date" in this Supplement.

(5) See "Terms Sheet — Interest Rates" in this Supplement.

**Barclays**

**Loop Capital Markets LLC**

The date of this Offering Circular Supplement is November 20, 2012.

Exhibit H

SEE EXhibiT D

MERS Agreement

ExhiBIT I

*ARE Trading on My NAME.*



**United States Patent and Trademark Office**
Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Mon Dec 11 03:47:14 EST 2017*

Logout  *Please logout when you are done to release system resources allocated for you.*

Start  List At:    OR  Jump  to record:    105229 Records(s) found (This page: 1 ~ 100)

Refine Search: BEVERLY ANN YOUNG          Submit

Current Search: S2: BEVERLY ANN YOUNG docs: 105229 occ: 168302

| | Serial Number | Reg. Number | Word Mark | Check Status | Live/Dead |
|---|---|---|---|---|---|
| 1 | 87710778 | | TRAILGUARD | TSDR | LIVE |
| 2 | 87710743 | | SUPER-OXYGEN LIGHT | TSDR | LIVE |
| 3 | 87710734 | | SUPER-OXYGEN TECHNOLOGY | TSDR | LIVE |
| 4 | 87710676 | | | TSDR | LIVE |
| 5 | 87710626 | | PURE-LIGHT | TSDR | LIVE |
| 6 | 87710499 | | BISCUIT BALLERINA | TSDR | LIVE |
| 7 | 87710485 | | BISCUIT BALLERINA | TSDR | LIVE |
| 8 | 87710400 | | VERRA | TSDR | LIVE |
| 9 | 87710183 | | PONCAT | TSDR | LIVE |
| 10 | 87710166 | | COCKTAIL GLOSS | TSDR | LIVE |
| 11 | 87710145 | | RMD | TSDR | LIVE |
| 12 | 87710108 | | RAFT LIFE | TSDR | LIVE |
| 13 | 87709739 | | | TSDR | LIVE |
| 14 | 87709736 | | CONTEGRITY | TSDR | LIVE |
| 15 | 87709527 | | CHEF ANDREAS | TSDR | LIVE |
| 16 | 87709503 | | JONTE "NOT SO SMALL" HALL | TSDR | LIVE |
| 17 | 87709486 | | BLACK RAIN CAFE | TSDR | LIVE |
| 18 | 87701887 | | THE 4 MIND-BODY-SOUL KEYS! "THE 4MBS KEYS" | TSDR | LIVE |
| 19 | 87701872 | | THE BRUSHING TECHNIQUE | TSDR | LIVE |
| 20 | 87701859 | | DR. HOCKEY | TSDR | LIVE |
| 21 | 87701837 | | CAPTERA | TSDR | LIVE |
| 22 | 87701634 | | BOBATOV | TSDR | LIVE |
| 23 | 87701515 | | YOUNG HOUSE LOVE | TSDR | LIVE |
| 24 | 87701493 | | DR. HOCKEY | TSDR | LIVE |
| 25 | 87701395 | | BH B.LL.Y USA | TSDR | LIVE |
| 26 | 87701369 | | THE SMOKING JACKET | TSDR | LIVE |
| 27 | 87701345 | | THESMOKINGJACKET | TSDR | LIVE |
| 28 | 87701277 | | RASTIN | TSDR | LIVE |
| 29 | 87701244 | | KUKIMBE | TSDR | LIVE |
| 30 | 87701239 | | REAL JEW APPAREL | TSDR | LIVE |
| 31 | 87701227 | | BEVERLY HILLS COWBOY | TSDR | LIVE |
| 32 | 87701206 | | IPOHUB | TSDR | LIVE |
| 33 | 87701005 | | CROWS-DEFEAT | TSDR | LIVE |
| 34 | 87596887 | | WOW IN THE WORLD | TSDR | LIVE |
| 35 | 87596883 | | EYES UP. SCREENS DOWN. JAWS DROPPED. | TSDR | LIVE |
| 36 | 87596878 | | WOW IN THE WORLD | TSDR | LIVE |
| 37 | 87596876 | | TINKERCAST | TSDR | LIVE |
| 38 | 87596864 | | | TSDR | LIVE |
| 39 | 87596807 | | TINKERCAST | TSDR | LIVE |
| 40 | 87596751 | | PATAUA | TSDR | LIVE |
| 41 | 87596611 | | NF NICOLE FRANK | TSDR | LIVE |
| 42 | 87596572 | | THE WARDROBE EVOLUTION | TSDR | LIVE |
| 43 | 87596451 | | VEGAINZ | TSDR | LIVE |
| 44 | 87596415 | | THE BUZZ BOOK | TSDR | LIVE |
| 45 | 87596373 | | QUOTENOTES | TSDR | LIVE |
| 46 | 87596345 | | YEO NETWORK | TSDR | LIVE |
| 47 | 87594645 | | LIFE TOKEN | TSDR | LIVE |
| 48 | 87592773 | | JORG | TSDR | LIVE |
| 49 | 87589418 | | THE CARAWAYBOU DEER CREEK | TSDR | LIVE |
| 50 | 87552711 | | PSYCHARMOR INSTITUTE | TSDR | LIVE |
| 51 | 87547828 | | CASEY ANN'S CANDY BOUTIQUE | TSDR | LIVE |
| 52 | 87541208 | | ROYAL KOREA MINT | TSDR | LIVE |

*Exhibit J*

 **United States Patent and Trademark Office**
Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

### Trademarks > Trademark Electronic Search System (TESS)

TESS was last updated on Mon Dec 11 03:47:44 EST 2017

Logout *Please logout when you are done to release system resources allocated for you.*

Start List At: ☐ OR Jump to record: **4397221 Records(s) found (This page: 1 ~ 100)**

Refine Search BEVERLY A YOUNG ☐ Submit

Current Search: S1: BEVERLY A YOUNG docs 4397221 occ 13401030

| | Serial Number | Reg. Number | Word Mark | Check Status | Live/Dead |
|---|---|---|---|---|---|
| 1 | 87976397 | | CRIME - INVESTIGATION | TSDR | LIVE |
| 2 | 87976331 | | LD LAKEDAD | TSDR | LIVE |
| 3 | 87976267 | | EDGAR - ASH | TSDR | LIVE |
| 4 | 87975456 | | WOVNS | TSDR | LIVE |
| 5 | 87711130 | | MAGICAL MATCH | TSDR | LIVE |
| 6 | 87711127 | | | TSDR | LIVE |
| 7 | 87711126 | | SMARTLIFE CHOCOLATE | TSDR | LIVE |
| 8 | 87711124 | | DEFY ADVERSITY | TSDR | LIVE |
| 9 | 87711122 | | YOUCAN | TSDR | LIVE |
| 10 | 87711120 | | RESCUE THE JUNGLEBEE | TSDR | LIVE |
| 11 | 87711119 | | AV | TSDR | LIVE |
| 12 | 87711116 | | AFFORDABLEVET | TSDR | LIVE |
| 13 | 87711115 | | UNDER THE INFLUENCE | TSDR | LIVE |
| 14 | 87711114 | | XURE MEZCAL | TSDR | LIVE |
| 15 | 87711113 | | BEIGAON | TSDR | LIVE |
| 16 | 87711111 | | RISELAND OUTFITTERS | TSDR | LIVE |
| 17 | 87711109 | | CISKAY | TSDR | LIVE |
| 18 | 87711107 | | THE MARK CONSISTS OF STYLIZED WORDS RALPHIE & OLLIE | TSDR | LIVE |
| 19 | 87711105 | | NAETERRA AROMATHERAPY CLEANING CONCENTRATE | TSDR | LIVE |
| 20 | 87711104 | | SAR HAWK | TSDR | LIVE |
| 21 | 87711100 | | SD60GS ELEVATOR SMOKE CONTAINMENT | TSDR | LIVE |
| 22 | 87711097 | | BAYCAY | TSDR | LIVE |
| 23 | 87711095 | | ENGYEN | TSDR | LIVE |
| 24 | 87711094 | | | TSDR | LIVE |
| 25 | 87711093 | | | TSDR | LIVE |
| 26 | 87711091 | | TONTON | TSDR | LIVE |
| 27 | 87711089 | | BANANA AT THE STANDARD | TSDR | LIVE |
| 28 | 87711088 | | WARMWIND | TSDR | LIVE |
| 29 | 87711086 | | YKOPEO | TSDR | LIVE |
| 30 | 87711082 | | GAIA WATER IS EVERYTHING | TSDR | LIVE |
| 31 | 87711080 | | C CLARITY CLINIC | TSDR | LIVE |
| 32 | 87711078 | | GALROSE DEZIGNS | TSDR | LIVE |
| 33 | 87711074 | | GROVO MICROLEARNING | TSDR | LIVE |
| 34 | 87711072 | | | TSDR | LIVE |
| 35 | 87711070 | | DUOFU | TSDR | LIVE |
| 36 | 87711068 | | SCORCHRAY | TSDR | LIVE |
| 37 | 87711066 | | SENSORY, TOUCH MARK | TSDR | LIVE |
| 38 | 87711065 | | SENSORY, TOUCH MARK | TSDR | LIVE |
| 39 | 87711063 | | | TSDR | LIVE |
| 40 | 87711062 | | SUN EARTH & U | TSDR | LIVE |
| 41 | 87711061 | | | TSDR | LIVE |
| 42 | 87711060 | | | TSDR | LIVE |
| 43 | 87711058 | | | TSDR | LIVE |
| 44 | 87711057 | | | TSDR | LIVE |
| 45 | 87711056 | | UNION COFFEE CO. | TSDR | LIVE |
| 46 | 87711054 | | SAINT RAFAEL PRODUCTIONS | TSDR | LIVE |
| 47 | 87711053 | | EVKVO | TSDR | LIVE |
| 48 | 87711052 | | | TSDR | LIVE |
| 49 | 87711051 | | SOMM GEAR | TSDR | LIVE |
| 50 | 87711049 | | ARK CARE | TSDR | LIVE |
| 51 | 87711047 | | SATSENG | TSDR | LIVE |
| 52 | 87711040 | | ZUHUCPTS | TSDR | LIVE |



Return Mail Operations
PO Box 10368
Des Moines, IA 50306-0368

August 27, 2014

001960 /Y/

BEVERLY A YOUNG
1905 E 172ND ST
SOUTH HOLLAND IL 60473-3727

CONFIRMATION OF LOAN PAYOFF

RE: Client       936
Loan Number    0431567163

Mortgagor(s)    Beverly A Young           FHA Sec/Case Number     703 / 137-671221

Property Address    1905 E 172nd Street
                  South Holland IL 60473

Congratulations! We are pleased to inform you that we have processed the funds necessary to pay your loan in full. We are providing the following information to address any questions you may have and to let you know what to expect through the loan payoff process.

If you are changing addresses, please call us immediately at (800) 222-0238. It is very important that we have your correct mailing address in order to send documents, year-end tax information and any refunds which may be due.

If you are retaining ownership of this property, you are obligated to pay future tax and/or insurance premiums unless a new escrow account is established. Listed on the second page are the name, address and phone number of each taxing authority and insurance company you will need to contact for billing information.

We will notify the U.S. Department of Housing and Urban Development (HUD) of the payoff of your loan. If you are entitled to a refund from HUD for your mortgage insurance, they will automatically send you an application in 90 to 120 days. You may contact HUD at 1-800-697-6967 or online at www.hud.gov/offices/hsg/comp/refunds/fhafact.cfm.

We will mail loan satisfaction documents to you or your county recorder, according to state guidelines. In order to record the payoff of this loan with your county, funds previously received may not be rejected/returned by the institution upon which they are drawn.

Wells Fargo Home Mortgage is committed to release the liens on the loans it services that are accurately paid in full within the appropriate statutory framework. At the end of the year, we will also mail you an annual tax and interest statement for IRS reporting purposes.

If you have any questions about your loan payoff, our service representatives can help you. They can be reached at (800) 222-0238, Mon - Fri 6 am to 10 pm or Saturday 8 am - 2 pm Central Standard Time.

We are pleased to have been of service to you and would welcome the opportunity to provide future financing solutions. If you are interested in learning about products and services offered by Wells Fargo, please visit us at www.wellsfargo.com.

Wells Fargo Home Mortgage

Exhibit K

Wells Fargo Online®

Last Sign On: August 27, 2014
**Account Summary**

**Loan Accounts**

| Account | Outstanding Principal Balance | Related Activities |
|---|---|---|
| MORTGAGE XXXXXX7163 | PD IN FULL | |
| Total | $0.00 | |

⌂ **Equal Housing Lender**
© 1995 – 2014 Wells Fargo. All rights reserved.

**Certified Mailing Receipt:  7014 2120 0001 1117 3494**

October 12, 2016

Mr. Christopher S. Laria
or Acting CEO/CFO
Anselmo Lindberg Oliver, LLC
1771 w. Diehl Road, Suite 120
Naperville, IL  60563-4947

**Re:    File Number F16090096FT – Wells Fargo Bank, N.A.**

Mr. Laria:

Thank you for your Correspondence regarding the above-referenced accounts for Wells Fargo
Bank, N.A.

I declare Myself competent.  I am not a Corporation or a Public Entity.

You, Anselmo Lindberg Oliver LLC and Christopher Laria must be a Third-Party Debt Collector
and I do not give you permission to interfere into My Commercial affairs or resale this debt.  If
you are assuming that you are representing me, you are Hereby Fired and your Power of
Attorney is Hereby Revoked.

As proof of claim, complete the attached "CREDITOR DISCLOSURE STATEMENT" and
return within 30 days.  Failure to respond with the completed "CREDITOR DISCLOSURE
STATEMENT", thereby providing your verified Proof of Claim, signed under the Penalties of
Perjury and verified by your affidavit, you, Anselmo Lindberg Oliver LLC and Christopher Laria
are agreeing to your Commercial Dishonor, exhausting My Administrative Remedies.  I will
accept your Silence as an Acceptance, and your agreement that a Default be entered against you.
You will also agree to a Full Tacit Contractual Agreement being a participant in Fraud and to
forfeit all remedies under Administrative Law, Judicial Law, and/or MARTIME CLAIM RULES
C (6).

You should also be aware that sending unsubstantiated demands for payment through the United
States Mail System might constitute mail fraud under federal and state law.

At this time I will also inform you that if your offices have reported invalidated information to
any of the three (3) major Credit Bureaus (Equifax, Experian or TransUnion) this action might
constitute fraud under both Federal and State Laws.  Due to this fact, if any negative mark is
found on any of my credit reports by your company or the company that you represent, I will not
hesitate in bringing legal action against you for the following:

- Violation of the Fair Credit Reporting Act;
- Violation of the Fair Debt Collection Practice Act; and
- Defamation of Character

Exhibit L

**Certified Mailing Receipt: 7014 2120 0001 1117 3494**

I am the secured party creditor for the Beverly Ann Young en legis and Estate (see enclosed UCC-1) and I have enclosed a W-8BEN and W-8IMY which I will forward to the Bureau of Public Debt to let them know Anselmo Lindberg Oliver LLC (a debt collector) is withholding from me. I have mailed this information to the IRS with a 3949A to let them know Codilis and the other defendants are not operating in proper trust law and have stolen trust funds so they can trace the money trail.

I will also be filing a Complaint with the Federal Court and Anselmo Lindberg Oliver LLC will be added as a Defendant as soon as you are substituted as counsel.

> All Rights Reserved Without Prejudice
> :beverly-ann :jones-young
>
> :beverly-ann :jones-young

Enclosures

cc: Legal Department

**Certified Mailing Receipt: 7014 2120 0001 1117 3494**

From: :beverly-ann :jones-young
c/o 1905 E. 172nd Street
South Holland, Illinois [60473]

Anselmo Lindberg Oliver LLC / Christopher Laris or acting CEO/CFO

Checklist of enclosed package in certified mailing receipt # 7014 2120 0001 1117 3494

1. Freedom of Information Request for Interrogatories **30 Day Notice** Cover Letter
   for Wells Fargo Bank N.A. (1 page);

2. Freedom of Information Interrogatories Deposition and Discovery of Alleged
   Debt Collectors/Creditors Disclosure Statement for Wells Fargo Bank N.A. (4 pages).

_____

Third Party Witness of the above mailing checklist package          Print/Sign Name

cc: Legal Department

**Freedom of Information Request for Interrogatories Deposition and Discovery of Alleged Debt**
**Collectors/Creditors Disclosure Statement**
**Made to**
**Name of Financial Institution: Anselmo Lindberg Oliver LLC**
**To: Christopher S. Laria or Acting CEO/CFO**

**NOTE: <u>Please be aware that acts under color of authority are against the law and you can be sued in federal court pursuant to Public Volume 17 42nd Congress Stat 13-15 shown as code at USC title 42 section 1983 for Action under Color of Authority or Fraudulent and or illegal transactions</u>**

The purpose of this Freedom of Information request is for the Director(s) of this Financial Institution who are under oath and obligation to United States Laws and statute to provide a copy of the original contracts certifying that they are the holders of the instrument of question in regards to alleged File numbers F16090096FT under CUSIP Number (?) and to provide an Affidavit Certifying their Affirmation that they follow all applicable Federal, State, and contract law in carrying out the alleged contract of note File numbers F16090096FT to satisfy the requester that this Financial entity is operating within the bounds of the law that the Financial entity is subject to and that they have a legitimate claim as a Creditor.

Specifically the Law includes the National Bank Act also known as The National Currency Act, The Consumer Credit Protection Act, The Fair Debt Collections Practices Act, The Fair Credit Reporting Act, Truth and Lending Act and any and all applicable to Financial Institutions whether they be federal, state, or contractual (commercial) laws.

I am officially requesting the following:

1) You produce my original signature in respect to the alleged contract and state for the record who the alleged original creditor was based on the preceding law;
2) Provide an Affidavit Certifying that you did not breach any federal state contractual commercial or official oath in carrying out the alleged contract and associated transactions; and
3) Certify that you did not unlawfully without my consent use my signature to gain assets from a third party then claim you loaned me money and that you did not commit any action that would preclude that you used my identity in a fraudulent or illegal manner yourself or in collusion with a third party or additional parties.

You are bond by law to provide this information upon a request pursuant to FOIA USC 5 section 552 and the Fair Debt Collections Practices Act along with the aforementioned laws.

Enclosed is a list of questions that Christopher S. Laria or acting CEO/CFO must answer. All questions must be answered within 30 days from time of receipt under penalty and perjury, if not answered you will be held in default. **Please answer all of the attached interrogatories.**

**Please forward the requested information to:**

**:beverly-ann :jones-young**
**c/o 1905 E. 172nd Street**
**South Holland, Illinois [60473]**

Name of Agent Authorizing Transaction:

Title of Agent:

Date:

Bureau/Agency of the Department

If Needed: Reason based on Internal Policy and or Laws and Statutes for Rejection of Request

_____
_____

*** If you are willing to settle this matter with complete removal of this alleged debt please respond with the appropriate offer""""

Signature of Agent: _____

County _____      State _____

Sworn and Subscribed before me _____ this _____ day of _____ [year]_____

Notary Signature

**INTERROGATORIES Depositions for Disclosure & Discovery**
**ALLEGED DEBT COLLECTOR/CREDITOR DISCLOSURE STATEMENT**
**Re "Offer of Performance"**

*This statement and the answers contained herein may be used by the Issuer & Maker, if necessary, in any court of competent jurisdiction*

## Respondent's Interrogatories/Depositions for Alleged Creditor

Notice: This Debt Collector/Creditor Disclosure Statement is not a substitute for, nor the equivalent of, the hereinabove-requested verification of the record, i.e. *"Confirmation of correctness, truth, or authenticity, by affidavit, oath, or deposition"* (Black's Law Dictionary, Sixth Edition, 1990), re the alleged debt, and must be completed in accordance with the United States Statutes at Large including the National Bank Act also known as the national Currency Act Public Law Volume 13 38th Congress Stat 99-118 as well as 91 Stat880 the Actual Law of the primae facie code of the *Fair Debt Collection Practices Act*, 15 USC § 1692g and the Freedom of Information Act 5 USCA § 552, applicable portions of *Truth in Lending (Regulation Z)*, 12 CFR 226 Contract Disclosure and UCC 1-308, and demands as cited above in Offer of Performance. Debt Collector/Creditor must make all required disclosures clearly and conspicuously in writing re the following:

1. NAME OF ALLEGED DEBT COLLECTOR/CREDITOR:
..................................................................................................................................

2. Address of Debt Collector/Creditor:
..................................................................................................................................

3. Correct Lawful Name of Living Being, alleged Debtor/Obligor:

4. Are you required to register with the United States Department of Treasury as a financial Institution?

5. Please provide the Documents that certify that you are a financial institution registered with the federal government through the United States Department of Treasury.

6. Have you exchanged the alleged note for bonds from the United States Treasury? If yes please provide exchange notes certifications and other information.

7. Have you oathed yourself to follow the laws governing Banks which are The National Bank Act Statutes at large Public Laws of United States Congress Published at Volume 13 38th Congress Stat99-118?

8. Please provide a certified copy of your oath.

9. Have you ever violated the above Laws in any manner?

10. Are you aware that if you violate any part of The National Currency Act Statutes at large Public Laws of United States Congress Published at Volume 13 38th Congress Stat99-118 that your financial institution can be shutdown

11. Please provide a list of all of the directors of your financial institution pursuant to the Freedom of Information Act.....................................................................................................................

12. Alleged Account Number:
#########..............................................................................................................................

13. Alleged debt owed: $
$####..................................................................................................................................

14. Date alleged debt became payable:
..................................................................................................................................

15. What is the name and address of the alleged Original Creditor who actually provided funds to the alleged Debtor/Obligor, if different from alleged Debt Collector/Creditor?

..................................................................................................................................................

16. If Debt Collector/Creditor is different from alleged Original Creditor, does Debt Collector/Creditor have a bona fide affidavit of assignment the signature of the alleged Debtor/Obligor as an assignment for entering into alleged original contract between alleged Original Creditor and alleged Debtor/Obligor?
    YES   NO

17. Are you the holder of the Original note/contract?

18. Are you the holder in due course of the Original Note and or Contract and if so please provide front and back copies of the original contract and or note

19. If applicable, give the date of purchase of this alleged account from alleged Original Creditor, purchase amount, and a copy of the original transaction:

1

| Date: | .................................................................. Amount:<br>$................................................................. |
| --- | --- |

| Date: | .................................................................. Amount:<br>$................................................................. |
| --- | --- |

20. Regarding this alleged account, Debt Collector/Creditor is currently the:

   (a) Owner; (b) Assignee; (c) Other-explain:
   .............................................................................................

   ............................................................................................................................................................

21.   Has the alleged Debt Collector/Creditor provided alleged Debtor/Obligor with the requisite *verification* of the alleged debt as required by the *Fair Debt     Collection Practices Act*? YES NO

22.   Date said verification cited above in #23 was provided alleged Debtor/Obligor with official copy and certification that it was sent to alleged Debtor/Obligor:

23.   Does Debt Collector/Creditor receive Letter of Credit Financing from a major financial institution to run its operational budget?

24.   Please Provide the 1096 and 1098 Tax Returns for this account.

   25.   Please Provide the 1099 OID and the 1099 INT forms for this account.

   26.   Are you [Alleged Creditor] the payor or the recipient on the 1099 OID forms?

   27.   Have you [Alleged Creditor] ever received any benefit from a third party financial institution due to the alleged contract with the alleged obligor?

   28.   Have you [Alleged Creditor] ever received stocks, bonds, securities or any other commercial items from any third party institutions in respect to the alleged contract with the obligor?

   29.   Are their any stocks, bonds, or securities attached to the contract between you [Alleged Creditor] and the alleged obligor?

   30.   If the answer to the former question is yes could you please provide the CUSIP number for the said financial instrument?

   31.   Please provide certified copies of the N-8A registration filed pursuant to section 8A of the Investment Company Act of 1940, the 10 K annual report, the S-3 registration statement and the S-4 prospectives filed pursuant to Rule 425 (b) 5 with the Securities and Exchange Commission under section 13 & 15 (d) of the Securities and Exchange Act of 1934 in reference to this account and any certificated or uncertificated stocks, bonds, securities, or other financial instruments associated with this account.

   32.   Was alleged Debtor/Obligor provided with a loan by Debt Collector/Creditor? YES NO

   33.   If the alleged Debtor/Obligor was provided with a loan does the Debt Collector/Creditor have proof that assets were provided from the financial institution to the alleged obligor. Please provide certified copies, front and back of all documentary proof.

   34.   At the time the alleged original contract was executed, were all parties apprised of the meaning of the terms and conditions of said alleged original contract and was full disclosure of the nature of the contract provided to the alleged obligor? YES NO

   35.   At the time the alleged original contract was executed, were all parties advised of the importance of consulting a licensed Legal professional before executing the alleged contract? YES NO

   36.   At the time the alleged original contract was executed, were all parties apprised that said alleged contract was a private credit Instrument? YES NO

Debt Collector/Creditor's failure, both intentional and otherwise, in completing/answering points "1" through "58" above and returning this Debt Collector/Creditor Disclosure Statement, as well as providing Maker with the requisite *verification* validating the hereinabove-referenced alleged debt, constitutes Debt Collector/Creditor's tacit agreement that Debt Collector/Creditor has no verifiable, lawful, bona fide claim re the hereinabove-referenced alleged account, and that Debt Collector/Creditor tacitly agrees that Debt Collector/Creditor waives all claims against Maker and indemnifies and holds Maker harmless against any and all costs and fees heretofore and hereafter incurred and related re any and all collection attempts involving the hereinabove—referenced alleged account.

Declaration: The Undersigned hereby declares under penalty of perjury of the laws of this State that the statements made in this Debt Collector/Creditor Disclosure Statement are true and correct in accordance with the Undersigned's best firsthand knowledge and belief.

| Date | Printed name of Signatory | |
|------|---------------------------|--|

Official Title of Signatory                    Authorized Signature for Debt Collector/Creditor

Debt Collector/Creditor must timely complete and return this Debt Collector/Creditor Disclosure Statement, along with all required documents referenced in said Debt Collector/Creditor Disclosure Statement. Debt Collector/Creditor's claim will not be considered if any portion of this Debt Collector/Creditor Disclosure Statement is not completed and timely returned with all required documents, which specifically includes the requisite *verification*, made in accordance with law and codified in the *Fair Debt Collection Practices Act* at 15 USC § 1692, Freedom of Information Act 5 USCA § 552 et seq., and which states in relevant part: "*A debt Collector/Creditor may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt,*" which includes "*the false representation of the character, or legal status of any debt,*" and "*the threat to take any action that cannot legally be taken,*" all of which are violations of law.

If Debt Collector/Creditor does not respond as required by law, Debt Collector/Creditor's claim will not be considered and Debt Collector/Creditor may be liable for damages for any continued collection efforts, as well as any other injury sustained by Maker of this Document. Please allow thirty (30) days for processing after Respondents receipts of Debt Collector/Creditor's response.

3

Doc#. 1404908027 fee: $50.00
Date: 02/18/2014 09:29 AM Pg: 1 of 1
Cook County Recorder of Deeds
*RHSP:$9.00 RPRF:$1.00 FEES Applied

***Send All Notices to Assignee***

RECORDING REQUESTED BY:
**WELLS FARGO BANK, N.A.**
**1000 BLUE GENTIAN RD**
**MAC: X9998-018**
**EAGAN MN 55121**

WHEN RECORDED MAIL TO:
**WELLS FARGO BANK, N.A.**
**ASSIGNMENT TEAM**
**MAC: X9998-018**
**PO BOX 1629**
**MINNEAPOLIS MN 55440-9049**

Prepared By:
**SUNIL VENUGOPAL**

MERS ID: **100394010800194541**
MERS Telephone: **1-888-679-6377**

## ASSIGNMENT OF MORTGAGE

For good and valuable consideration, the sufficiency of which is hereby acknowledged, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR AMERICAN FIDELITY MORTGAGE SERVICES, INCORPORATED, ITS SUCCESSORS AND ASSIGNS**, P.O. BOX 2026 FLINT, MI 48501 . By these presents does convey, grant, bargain, sell, assign, transfer, and set over to: **WELLS FARGO BANK, NA , 1 HOME CAMPUS , DES MOINES, IA 50328** . The Mortgage described therein with all interest, all liens, and any rights due or to become due thereon. Said Mortgage for **$87718.00** is recorded in the State of **IL** , County of Cook Official Records, dated **10/16/2012** and recorded on **12/03/2012**, as Instrument No. **1233816028** , in Book No. , at Page No. .
Legal Description: **LOT 50 IN HUGUELET'A 7TH ADDITION TO SOUTH HOLLAND BEING A SUBDIVISION OF A PART OF THE NORTH 1/2 OF THE NORTHWEST 1/4 OF SECTION 25, LYING EAST OF THE THREAD LINE OF THORN CREEK, ALL IN TOWNSHIP 36 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS FOR INFORMATIONAL PURPOSES ONLY COMMON ADDRESS 1905 EAST 172ND STREET, SOUTH HOLLAND, IL 60473 PIN# 29-25-110-009-0000**
Property Address: 1905 E 172ND STREET SOUTH HOLLAND, IL 60473
Parcel Identifier No: 29-25-110-009-0000
Original Mortgagor: **BEVERLY A YOUNG, MARRIED**
Original Mortgagee: **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR AMERICAN FIDELITY MORTGAGE SERVICES, INCORPORATED, ITS SUCCESSORS AND ASSIGNS**
Date: 02/14/2014

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR AMERICAN FIDELITY MORTGAGE SERVICES, INCORPORATED, ITS SUCCESSORS AND ASSIGNS**
By: *Stephanie Therese Tautges*

**STEPHANIE THERESE TAUTGES, Assistant Secretary**

STATE OF **MN** }
COUNTY OF **Dakota** } ss.

On 02/14/2014 , before me, **KELLEY CHRISTINE BUTIKOFER** a Notary Public, personally appeared **STEPHANIE THERESE TAUTGES** personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity (ies) and that by his/her/their signature(s) on the instrument the person(s), or entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

*Kelley Butikofer*

(Notary Name): **KELLEY CHRISTINE BUTIKOFER**
My Commission Expires: 01/31/2017



KELLEY CHRISTINE
BUTIKOFER
NOTARY PUBLIC-MINNESOTA
My Commission Expires January 31, 2017

eRecorded

Exhibit M



**Certified Forensic Loan Auditors**

## ASSIGNMENT OF MORTGAGE # 1 - Recorded February 18, 2014

**Stephanie Therese Tautges** signs for Mortgage Electronic Registration Systems, Inc., as Assistant Secretary without disclosure of employment. This is an indication that Mrs. **Tautges** attempted to assign the Mortgage to client Wells Fargo without an Assignor. This position of unilateral transfer is further strengthened by the fact that here is no evidence of verified proof of funds; a note endorsement; a bill of sale; a declaration of value; or transfer taxes as having been paid to Cook County, Washington "For Good and Valuable Consideration".

MERS ID: **100394010800194541**
MERS Telephone: **1-888-679-6377**

### ASSIGNMENT OF MORTGAGE

For good and valuable consideration, the sufficiency of which is hereby acknowledged, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR AMERICAN FIDELITY MORTGAGE SERVICES, INCORPORATED, ITS SUCCESSORS AND ASSIGNS, P.O. BOX 2026 FLINT, MI 48501. By these presents does convey, grant, bargain, sell, assign, transfer, and set over to: WELLS FARGO BANK, NA, 1 HOME CAMPUS, DES MOINES, IA 50328. The Mortgage described therein with all interest, all liens, and any rights due or to become due thereon. Said Mortgage for S87718.00 is recorded in the State of IL., County of Cook Official Records, dated 10/16/2012 and recorded on 12/03/2012, as Instrument No. 1233816028, in Book No., at Page No.. Legal Description: LOT 50 IN HUGUELET'A 7TH ADDITION TO SOUTH HOLLAND BEING A SUBDIVISION OF A PART OF THE NORTH 1/2 OF THE NORTHWEST 1/4 OF SECTION 25, LYING EAST OF THE THREAD LINE OF THORN CREEK, ALL IN TOWNSHIP 36 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS FOR INFORMATIONAL PURPOSES ONLY COMMON ADDRESS 1905 EAST 172ND STREET, SOUTH HOLLAND, IL 60473 PIN# 29-25-110-009-0000
Property Address: 1905 E 172ND STREET SOUTH HOLLAND, IL 60473
Parcel Identifier No: 29-25-110-009-0000
Original Mortgagor: BEVERLY A YOUNG, MARRIED
Original Mortgagee: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR AMERICAN FIDELITY MORTGAGE SERVICES, INCORPORATED, ITS SUCCESSORS AND ASSIGNS
Date: 02/14/2014

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR AMERICAN FIDELITY MORTGAGE SERVICES, INCORPORATED, ITS SUCCESSORS AND ASSIGNS
By: *Stephani Therese Tautges*

**STEPHANIE THERESE TAUTGES, Assistant Secretary**

STATE OF **MN**
COUNTY OF **Dakota** } ss

On **02/14/2014**, before me, KELLEY CHRISTINE BUTIKOFER a Notary Public, personally appeared **STEPHANIE THERESE TAUTGES** personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity (ies) and that by his/her/their signature(s) on the instrument the person(s), or entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

*Kelley Butikofer*

(Notary Name): KELLEY CHRISTINE BUTIKOFER
My Commission Expires: 01/31/2017

> **KELLEY CHRISTINE BUTIKOFER**
> NOTARY PUBLIC-MINNESOTA
> My Commission Expires January 31, 2017

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*



*Robo signer*

## ASSIGNMENT OF MORTGAGE # 1 - Recorded February 18, 2014

**Stephanie Therese Tautges** signs for Mortgage Electronic Registration Systems, Inc., as Assistant Secretary without disclosure of employment. This is an indication that Mrs. **Tautges** attempted to assign the Mortgage to client Wells Fargo without an Assignor. This position of unilateral transfer is further strengthened by the fact that here is no evidence of verified proof of funds; a note endorsement; a bill of sale; a declaration of value; or transfer taxes as having been paid to Cook County, Washington "For Good and Valuable Consideration".

MERS ID: 100394010800194541
MERS Telephone: 1-888-679-6377

### ASSIGNMENT OF MORTGAGE

For good and valuable consideration, the sufficiency of which is hereby acknowledged, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR AMERICAN FIDELITY MORTGAGE SERVICES, INCORPORATED, ITS SUCCESSORS AND ASSIGNS , P.O. BOX 2026 FLINT, MI 48501** . By these presents does convey, grant, bargain, sell, assign, transfer, and set over to: **WELLS FARGO BANK, NA , 1 HOME CAMPUS , DES MOINES, IA 50328** . The Mortgage described therein with all interest, all liens, and any rights due or to become due thereon. Said Mortgage for **$87718.00** is recorded in the State of **IL** , County of **Cook** Official Records, dated **10/16/2012** and recorded on **12/03/2012**, as Instrument No. **1233816028** , in Book No. , at Page No. . Legal Description: **LOT 50 IN HUGUELET'A 7TH ADDITION TO SOUTH HOLLAND BEING A SUBDIVISION OF A PART OF THE NORTH 1/2 OF THE NORTHWEST 1/4 OF SECTION 25, LYING EAST OF THE THREAD LINE OF THORN CREEK, ALL IN TOWNSHIP 36 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS FOR INFORMATIONAL PURPOSES ONLY COMMON ADDRESS 1905 EAST 172ND STREET, SOUTH HOLLAND, IL 60473 PIN# 29-25-110-009-0000**
Property Address: **1905 E 172ND STREET SOUTH HOLLAND, IL 60473**
Parcel Identifier No: **29-25-110-009-0000**
Original Mortgagor: **BEVERLY A YOUNG, MARRIED**
Original Mortgagee: **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR AMERICAN FIDELITY MORTGAGE SERVICES, INCORPORATED, ITS SUCCESSORS AND ASSIGNS**
Date: **02/14/2014**

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR AMERICAN FIDELITY MORTGAGE SERVICES, INCORPORATED, ITS SUCCESSORS AND ASSIGNS
By:
**STEPHANIE THERESE TAUTGES, Assistant Secretary** — *Here she is Assistant Secretary*

STATE OF **MN**
COUNTY OF **Dakota** ¦ ss.

On **02/14/2014** , before me, **KELLEY CHRISTINE BUTIKOFER** a Notary Public, personally appeared **STEPHANIE THERESE TAUTGES** personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity (ies) and that by his/her/their signature(s) on the instrument the person(s), or entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

(Notary Name): **KELLEY CHRISTINE BUTIKOFER**
My Commission Expires: **01/31/2017**

**KELLEY CHRISTINE BUTIKOFER**
NOTARY PUBLIC-MINNESOTA
My Commission Expires January 31, 2017

*what job does she Really work -- is she an Assistant, Vice President on NOTARY*

*Exhibit N*



**Certified Forensic Loan Auditors**

**Stephanie Therese Tautges is shown to be a Vice President Loan Documentation for Wells Fargo Bank:**

**2012-055449**
8:32 am 04/23/12 AT Fee: 15.00
Count of Pages 1
Recorded in Official Records
Countyof San Mateo
Mark Church
Assessor-CountyClerk-Recorder

*R00013939 51*

*R000TSY5Y57*

AND WHEN RECORDED MAIL TO
WELLS FARGO BANK, N.A.
MAC: X9999-018
PO BOX 1629
MINNEAPOLIS, MN 55440-9790

MERS MIN#:
MERS PHONE#:

ASSIGNMENT OF DEED OF TRUST

For good and valuable consideration, the sufficiency of which is hereby acknowledged. WELLS FARGO BANK, N.A. , 1 HOME CAMPUS DES MOINES, IA 50328 . For VALUE RECEIVED, the undersigned hereby grants, assigns, and transfers to, "HSBC BANK USA, NATIONAL ASSOCIATION AS TRUSTEE FOR MERRILL LYNCH MORTGAGE INVESTORS TRUST, MORTGAGE-BACKED NOTES,MLCC SERIES 2005-2" , 636 GRAND REGENCY BLVD. BRANDON, FL 33510 assignee. all benefical interest under that certain deed of trust, together with the certain note(s) described therein with all interest, all liens, and any rights due or to become due thereon. Said Deed of Trust for $460000.00 is recorded in the State of CA , County of San Mateo Official Records, dated 06/09/2005 and recorded 06/16/2005 , as Instrument No. 2005-100204 , in Book No. — , at Page No. —
Executed by WENDELL RYAN CARPENTER AND ROBIN J. CARPENTER, HUSBAND AND WIFE as Trustors and WELLS FARGO BANK, N.A. as the original beneficiary. Legal Description: As more fully described in said Deed of Trust.
Dated: 04/23/2012

WELLS FARGO BANK, N.A.

*Stephanie Therese Tautges*

By: STEPHANIE THERESE TAUTGES Vice President Loan Documentation

*Here she is Vice President*

STATE OF MN
COUNTY OF Dakota } S.S.

On 04/23/2012 before me CHAN ERNEST HARRIES , a Notary Public, personally appeared STEPHANIE THERESE TAUTGES who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*

Sussex County Clerk  Instrument 20140214010022990  Book:9213 Page:454 Page:1 of 1

RECORDING REQUESTED BY:
WELLS FARGO BANK, N.A.
MAI VUE
1000 BLUE GENTIAN RD
MAC: X9998-018
EAGAN, MN 55121

AND WHEN RECORDED MAIL TO:
WELLS FARGO BANK, N.A.
ASSIGNMENT TEAM
MAC: X9998-018
PO BOX 1629
MINNEAPOLIS, MN 55440-9049

20140214010022990   1/1
02/14/2014 03:30:59 PM
ASS-M
Bk:9213 Pg:454
Jeffrey M. Parrott, County
Clerk
Sussex County, NJ

Parcel Identifier No:

**ASSIGNMENT OF MORTGAGE**

MERS ID: 100030900100137515
MERS Telephone: 1-888-679-6377

For Value Received, the undersigned holder of a Mortgage **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR NJ LENDERS CORPORATION, ITS SUCCESSORS AND ASSIGNS** (herein "Assignor") whose address is **P.O. BOX 2026 FLINT, MI 48501** , does hereby grant, sell, assign, transfer, and convey, unto **WELLS FARGO BANK, N.A.** (herein "Assignee"), whose address is **1 HOME CAMPUS , DES MOINES, IA 50328** , a certain Mortgage dated **07/18/2005** , made and executed by **WILLIAM R. ENGLEHARDT, IV** to and in favor of **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR NJ LENDERS CORPORATION, ITS SUCCESSORS AND ASSIGNS** , upon the following described property. Such Mortgage having been given to secure payment of **$164000.00** which Mortgage was recorded **08/08/2005** in Book **07050** , at Page **00179** , as Document No. **27582** , of the Records of Sussex County, State of NJ , together with the obligations therein described and the money due and to become due thereon with interest, and all rights accrued or to accrue under such Mortgage.

Legal Description:
TO HAVE AND TO HOLD the same unto Assignee, its successor and assigns, forever, subject only to the terms and conditions of the above-described Mortgage.

IN WITNESS WHEREOF, the undersigned Assignor has executed this Assignment of Mortgage on **02/13/2014** .

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR NJ LENDERS
CORPORATION, ITS SUCCESSORS AND ASSIGNS

SCOTT GERALD HEURKINS, Assistant Secretary

STATE OF MN
COUNTY OF Dakota } s.s.

On **02/13/2014** , before me **STEPHANIE THERESE TAUTGES** , Notary Public, personally appeared **SCOTT GERALD HEURKINS** , **Assistant Secretary** personally known to me (or proved to me on the basis of satisfactory evidence), to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument, the person or entity upon behalf of which the person acted, executed the instrument.

Witness my hand and official seal.

STEPHANIE THERESE TAUTGES
Commission #: 31045531
My Commission Expires: 01/31/2016

STEPHANIE THERESE TAUTGES
NOTARY PUBLIC-MINNESOTA
My Commission Expires
January 31, 2016

Here she
is NOTARy

Drafted By: MAI VUE

20140214010022990   1/1
02/14/2014 03:30:59 PM   ASS-M
Recording Fee: $40.00
Tax Fee: $.00
Consideration: $.00
Buyers Fee: $.00
WMACDONALD